NICK DRASKOVICH ET AL. *v.* NOVAK PASALICH ET AL.

[No. 172A13. Filed March 20, 1972. Rehearing denied August 11, 1972 with dissenting opinion by Hoffman, C.J., 285 N. E. 2d 830. Transfer denied May 7, 1973.]

*Charles W. Ainley, George E. Buckingham,* of Goshen, *F. Leroy Wiltrout,* of counsel, of Elkhart, for appellants.

*John W. Montgomery,* of South Bend, for appellees.

SHARP, J.—This case involves a dispute between two contesting groups in the Serbian Eastern Orthodox Church and School Parish of St. Peter and St. Paul in South Bend, Indiana, hereinafter called local church, for the use and control of the church property.

To understand the contentions of the parties it is necessary to outline certain developments within the Serbian Eastern Orthodox Church whose See is in Belgrade, Yugoslavia, hereinafter called Mother Church, particularly certain events in the year 1963 and since.

Generally the Mother Church is a part of the Eastern Orthodox branch of the Christian religious community which traces its practices through the division with the Roman Catholic Church in the 11th Century to the Council of Nicea in the year 325 A.D. There have been literally libraries written describing these historical events. One of the most succinct statements in this regard is set forth by the Supreme Court of Michigan in *Hanna* v. *Malick* (1923), 223 Mich. 100, 193 N. W. 798.

The rites, doctrines, polity and practices of the Serbian Eastern Orthodox Churches are closely related to those of the Eastern Orthodox Churches which developed in other eastern European and near eastern areas such as the Russian, Greek, Bulgarian and Romanian Eastern Orthodox Churches, and were the result of several centuries of development. Thus, the rites, doctrines, polity and practices are often complex and difficult for the uninitiated to understand. This fact is well born out in this case where we have a trial that lasted eight weeks producing a transcript of 4229 pages in nine separate volumes. A substantial portion of the trial of this case was an in-depth consideration of the rites, doctrines, polity and practices of the Mother Church and the Serbian Eastern Orthodox Diocese of the United States of America and Canada, hereinafter called United States and Canada Diocese, as well as the local church.

Prior to May 10, 1963, the local church was a constituent part of the United States and Canada Diocese of the Mother Church. This diocese as then constituted comprised the entire territory of the United States and Canada and was one of the dioceses of the Mother Church. The spiritual head of the Mother Church was the Serbian Patriarch and the power of appointment was vested in the Holy Assembly of Bishops, also known as the Holy Episcopal Council. Before May 10, 1963, Bishop Dionisije was designated as Bishop of the United States and Canada Diocese by the Holy Assembly of Bishops.

On that date the Holy Assembly with the approval of the Patriarch divided the United States and Canada Diocese into three new dioceses and added some new territory from Africa and South America. New Bishops were appointed in each of the three new dioceses. Bishop Dionisije opposed this division and sought the support of others. Dionisije was later defrocked on March 15, 1964. In general, the Plaintiffs-Appellees are supporters of Dionisije in the local church and the Defendants-Appellants are loyal to the Mother Church and desire to retain the hierarchical connection with the Mother Church.

In 1966, the Appellees brought an action for injunction to prohibit the Appellants from exercising control and ownership of the property in South Bend, Indiana. The prayer for relief in the Appellees' Petition for Injunction is revealing of the subject matter of the action. It states:

"WHEREFORE, plaintiffs pray that the defendants comprising the Board of Trustees of the church and the defendant Walter Milovich and each and every person acting in consort with them be restrained and enjoined from convening, conducting or holding any meeting of the membership of the church on March 22, 1964, and from submitting thereto any proposal to determine, by majority vote or otherwise, whether the membership of the church recognizes church affiliation with the mother church, the Serbian Orthodox Holy Synod, the Serbian Orthodox Holy Council of Bishops, and the Serbian Orthodox Bishop Firmillion Ocakoljich, or from doing any other act or causing any other member or group of members of the church to do any act calculated or intended to or which might separate or tend to separate the church from the Serbian Eastern Orthodox Diocese of the United States of America and Canada in defiance of the ecclesiastical laws, usages, customs and principles which are accepted by all members of the church prior to the pretended dissolution of the Serbian Eastern Orthodox Diocese of the United States of America and Canada in 1963 pending the giving of notice to the defendants of the hearing and the hearing on plaintiffs' application for temporary injunction, and that after due notice and hearing the defendants and all others acting in consort with them be

temporarily and permanently enjoined as prayed for herein and plaintiffs be granted all other and proper relief."

The trial court entered special findings and conclusions and granted a permanent injunction for the Appellees on August 15, 1968. The essential finding and conclusion which is in dispute is the determination that the Mother Church was without legal authority to divide the United States and Canada Diocese and therefore such action was null and void. Such decision necessarily removes the control and use of the property where the local church is located from the group which has remained faithful to the Mother Church.

The period between August 15, 1968, when the trial court entered judgment and late 1971 was taken up in the lengthy process of perfecting this appeal. This appeal was originally filed in the Supreme Court of Indiana which transferred it to this court for consideration on the merits by order on January 10, 1972. The Appellants have also filed a Brief in four volumes consisting of 1020 pages for our consideration. We realize that in cases such as this emotions run high. Counsel for all parties and the trial judge have handled this difficult case in a highly professional manner and are to be commended.

There are two questions which we must consider:

1. The nature of the church organization involved in this dispute.

2. Whether the decision of the trial court transgressed the boundaries of the First Amendment to the Constitution of the United States.

Notwithstanding the limitations imposed on the civil courts, which we will detail later, the civil courts can (and indeed must in some cases) look at ecclesiastical documents and related evidence concerning religious rites, doctrines, polity and practices for the limited purpose of determining the nature of the church organization.

The landmark and oft cited case, *Watson* v. *Jones* (1872), 13 Wall 679, 80 U.S. 679, sets forth and defines the three general categories of such organizations, the same being congregational, connectional and hierarchical. While the facts often do not fit neatly into these molds, and some church organizations represent a blend of more than one kind, the definitions are sufficient for us here.

We are here asked to review a massive volume of documentary evidence related to this and other issues. It is still the law of Indiana that upon appellate review the appellate tribunal is in as good a position as the trial court to interpret documentary evidence. Both parties have urged this rule on this court for a proper determination and have relied on Wiltrout, *Indiana Practice*, Vol. 3, § 2786.

In *Kedroff* v. *St. Nicholas Cathedral* (1952), 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120, the Supreme Court of the United States said: "hierarchical churches may be defined as (1) those organized as a body with other churches (2) have a similar faith and doctrine (3) with a common ruling convocation or ecclesiastical head . . ." 344 U.S. 110.

Some of the relevant articles are set forth and discussed below. The constitution of the United States and Canada Diocese contains 163 articles covering 33 pages in the transcript and the constitution of the Mother Church contains 269 articles which is published in a booklet of 82 pages. In addition there are the by-laws of the local congregation for the year 1916 which consists of 31 articles and the 1953 by-laws of the local congregation consisting of 86 articles for the church in addition to 32 articles for the local church club. There is also the articles of incorporation of the Serbian Society of St. Peter and St. Paul's Church of South Bend, Indiana, in 1928 consisting of four articles.

Article 1 of the Diocesan Constitution provides:

"The Serbian Orthodox Diocese in the Northern States of American and Canada is considered ecclesiastically-judicially as an organic part of the Serbian Patriarchate in the Kingdom of Yugoslavia and enjoys all the benefits which originate therefrom."

Article 2 of the Diocesan Constitution provides:

"All statutes and rules which regulate the ecclesiastical-canonical authority and position of the Serbian Orthodox Church in the Kingdom of Yugoslavia are also compulsory for the Serbian Orthodox Diocese in the United States of North America and Canada, with the exception of specific cases which must be formulated with regard to local circumstances in accordance with ecclesiastical and judicial principles."

Article 3 of the Diocesan Constitution provides:

"The jurisdiction of the Serbian Orthodox Diocese in the United States of America and Canada with its Diocesan See in Chicago, includes the entire political territory of the United States of America and Canada, which as such by its geographical location enjoys full administrative freedom and accordingly, it can independently regulate and rule the activities of its church, school and other diocesan institutions and all funds and beneficiaries, through its organs, but in accordance with the laws of this constitution and in agreement with the laws of the United States of America and Canada."

Article 4 of the Diocesan Constitution provides:

"The Serbian Orthodox Diocese in the United States of America and Canada is comprised of Serbian Orthodox Church-school Congregations—Parishes, churches, monasteries, archpresbyterates, established within the territory of the above mentioned states and which fall under the spiritual, executive, ecclesiastical—judicial and controlling authority of the diocesan organs (Bishop and Diocesan Council). Therefore, every Serbian Orthodox Church—school Congregation, churches, monastery, and archpresbyterate already existing or which shall be established in the above mentioned territories must be in ecclesiastical—

canonical bond with this Diocese and recognize its authority and power."

Article 9 of the Diocesan Constitution provides:

"The Bishop of the Serbian Orthodox Diocese in the United States of America and Canada is appointed by the Holy Assembly of Bishops of the Serbian Patriarchate."

Article 10 of the Diocesan Constitution provides:

\* \* \*

"The following comes within the jurisdiction of activity of the diocesan bishop:

(a) to preserve, defend and sustain among the people, One, Holy, Ecumenical and Apostolic church and repel all acivities contrary to Orthodoxy;

\* \* \*

(h) to execute all canonical orders of the Holy Assembly of Biships;

\* \* \*

(o) To inform the clergy and laity of various canonical directives from the Holy Pontifical Synod;

(p) To submit to the Holy Bishop's Assembly of the Serbian Patriarchate an annual report of his archipastoral activities; and ...".

Article 12 of the Diocesan Constitution provides:

"The Diocesan Bishop in the United States of America and Canada is obliged to recognize as the head of the Serbian Patriarchate, the Archbishop of Ipek, Metropolitan of Belgrade-Karlovac and Serbian Patriarch, whom he mentions in all services. He shall not make any changes or innovations in the established order and work of the church without prior agreement with him.

"Accordingly, the Diocesan Bishop shall submit to the Serbian Patriarch for review, all regulations which may be issued by any diocesan authority, which shall if they touch upon the sphere of internal church administrations, be subject to, the approval of the Holy Pontifical Synod, as the highest executive church authority.

"Should the Diocesan Bishop find by his own assurance, that the decisions by any church authority or organ are contrary to the teachings of the Holy Church, her regula-

tions and canons, or to the vital interest of the church, he shall halt the execution of such decision and submit the matter for rediscussion and redecision. If he again is not in accord with redecision as reconsidered, he shall submit the case for final decision to a higher authority and if necessary, to the Holy Pontifical Synod."

Article 13 of the Diocesan Constitution provides:

"In the event of illness or absence, the Diocesan Bishop assigns his own substitute and designates his authority. When the seat of the Diocese Bishop is vacated, the administration of the widdowed diocese is upheld in all her spiritual and administrative matters by the Ecclesiastical Court and the Diocesan Council until the appointment of an administrator, which appointment is made by the Serbian Patriarch with the Holy Pontifical Synod."

Article 14 of the Diocesan Constitution provides:

\* \* \*

"The Diocesan Bishop is at the same time the supreme head of the St. Sava Monastery in Libertyville. He appoints the abbot of same and conducts the canonical supervision and the higher executive authority over the monastery."

Article 53 of the Diocesan Constitution provides in part:

"Decisions made by the Diocesan Bishop alone or together with the Diocesan Ecclesiastical Court, have the validity and power of decrees of Ecclesiastical Courts in the first instance. The highest and final instance is the Holy Bishop's Synod."

Article 56 of the Diocesan Constitution provides:

"Court procedures and order of business of the Ecclesiastical Court will be prepared by the Ecclesiastical Court itself with the approval of the Holy Bishop's Assembly of the Serbian Church.

"If the Bishop should disagree with the decision of the Diocesan Ecclesiastical Court, as well as with the decision of some Diocesan committee or Diocesan Council, the matter in question will be sent to the Holy Bishop's Synod of the Serbian Church for final Decision."

Article 156 of the Diocesan Constitution provides:

"All real estate and personal property of the St. Sava Monastery in Libertyville as well as the other Serbian Monasteries should they be organized, is supervised by the monastery's administration under the direct control of the Diocesan Bishop."

The fundamental set of rules governing the Mother Church are set forth in Article 7 of its own Constitution.

The Constitution of the Mother Church so establishes the subordinate relation to the Diocese in the United States.

Article 1 of the Mother Church Constitution provides:

"The Serbian Orthodox Church is one, undivided, and autocephalous. The Church confesses publicly its religious teachings, performs publicly its religious services, and governs and regulates independently all its religious affairs. * * *"

Article 2 of the Mother Church Constitution provides:

"The Serbian Orthodox Church has a rank of a Patriarchate."
         *    *    *

Article 5 of the Mother Church Constitution provides:

"The legal persons in the Serbian Orthodox Church are these: Patriarchate, dioceses, church congregations, monasteries, foundations, independent institutions or such funds designated for places of worship.

"These legal persons may, in accordance with legal regulations, acquire and hold either personal or real properties, and have all the rights and obligations in that capacity."
         *    *    *

Article 8 of the Mother Church Constitution provides:

"Organization of the Serbian Orthodox Church is church-hierarchical and church-administrative.

"All the church spiritual, disciplinary and legal authority, in accordance with the canons and rules of the Serbian Orthodox Church, belongs exclusively to the hierarchy. This authority is exercised through its hierarchical representatives and organs."
         *    *    *

Article 10 of the Mother Church Constitution provides:

"In the Serbian Orthodox Church there are church hierarchical and administrative authorities, bodies and organs:

1. Patriarch, Holy Bishops Council and Holy Synod, High Ecclesiastical Court, Patriarchal Council and Patriarchal Board;

2. Diocesan Bishop, diocesan ecclesiastical court, diocesan executive board;

3. Bishop's vicar;

4. Parish priest;

5. Church congregational council and church congregational executive board;

6. Abbot and monastery brotherhood."

Article 12 of the Constitution of the Mother Church provides:

"The Serbian Orthodox Church is episcopal. Its main administrative division is composed of dioceses, both in regard to Church hierarchical and church administrative aspects."

Article 13 of the Mother Church Constitution provides:

"At the head of the Serbian Orthodox Church is the Serbian Patriarch, as its chief ruler. . . .

"At the head of each diocese there is a diocesan bishop as its direct rules. [sic]  He is, according to the church canonical regulations, chief representative and guiding leader of all church spiritual life and church order in the diocese and he rules the diocese assisted by his clergy and laymen."

Article 14 of the Mother Church's Constitution enumerates the dioceses located within the territory of Yugoslavia while Article 15 enumerates the dioceses located outside the geographical confines of Yugoslavia. Among the dioceses outside Yugoslavia is included the religious body in this country. The only distinction between dioceses within and without Yugoslavia is in administration. The dioceses located outside

Yugoslavia have internal administrative autonomy; however, they are hierarchically and sacramentally (canonically) an integral part of the Mother Church. Article 16 of the Constitution of the Mother Church authorizes the Holy Assembly to establish, liquidate, or reorganize dioceses.

Article 30 of the Mother Church Constitution provides:

\* \* \*

"The founding of new monasteries, as well as the merging of existing ones, is performed by the Diocesan Bishop, and he informs the Holy Synod of Bishops which grants the final approval."

Article 64 of the Mother Church Constitution provides:

"All the decisions of the Holy Assembly of Bishops and of the Holy Synod of Bishops of canonical and church nature, in regard to faith, officiation, church order and internal organization of the church are valid and final."

Article 2 of the Bylaws of the local congregation states:

"The Serbian Orthodox Church and School Parish of St. Peter and St. Paul, as [sic] a part of the Serbian Eastern Orthodox Diocese of the United States of America and Canada and as such upholds all of the church canon laws and other laws of the church, according to the head of the diocese, who is the Bishop, or his assistants."

We conclude that the relationship between the local church, United States and Canada Diocese and the Mother Church was based on a hierarchical structure within the meaning of *Watson* v. *Jones* and *Kedroff, supra.* Our decision that we are here dealing with a hierarchical church is bolstered by the decisions of courts in other jurisdictions dealing with the same question. See *Serbian Orthodox Diocese* v. *Ockoljich* (1966), 72 Ill. 244, 219 N. E. 2d 343; *Serbian Eastern Orthodox Congregation of "St. George"* v. *Serbian Eastern Orthodox Diocese for Eastern States of America and Canada* (1969), 106 N. J. Super. 22, 254 A. 2d 119; cert. den. 397 U.S. 961, rehearing den. 397 U.S. 1058

(1970) ; and *Serbian Orthodox Church Congregation of St. Demetrius* v. *Kelemen* (1970), 21 Ohio St. 2d 154, 256 N. E. 2d 212. For this same interpretation in a similar religious organization, see *St. Michael & Archangel Russian Orthodox Greek Catholic Church* v. *Uhniat* (1969), 436 Pa. 222, 259 A. 2d 862, cert. den. 400 U.S. 823, reh. den. 400 U.S. 930 (1971) ; *Macedono-Bulgarian Orthodox Church* v. *Macedonian Patriotic Organization* (1970), 27 Mich. App. 713, 184 N. W. 2d 233. In *Draglevich* v. *Rajsich* (1970), 24 Ohio App. 2d 59, 263 N. E. 2d 778, which wasn't cited by either party here, the court stated: "Our conclusion is that the creation or alteration of the diocese having supervision over this parish church and the appointment or removal of either the bishop presiding over the appropriate diocese or parish priest assigned to this church are matters of church government and constitutionally protected from state interference in the absence of any proof that the exercise of such powers was either fraudulent, collusive or arbitrary."

We must next turn our attention to the central issue in this case: Whether the trial court transgressed the First Amendment in deciding that the Mother Church's act in dividing the United States and Canada dioceses was null and void.

All concede that any remedy for the defrocking of Dionisije is not to be found in the civil courts and the trial court explicitly excluded any consideration of this issue.

The proper First Amendment touchstones have been set forth by the Supreme Court of the United States in a line of cases commencing with *Watson* v. *Jones* decided a century ago. The principles and limitations for review of church property disputes found in *Watson v. Jones* were elevated to constitutional status in *Kedroff* v. *St. Nicholas Cathedral* (1957), 344 U.S. 94, 83 S. Ct. 143, 97 L. Ed. 120 and *Kreshik* v. *St. Nicholas Cathedral* (1960), 363 U.S. 190. These were

more broadly stated in *Presbyterian Church of the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church* (1969), 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658. The last word from the Supreme Court of the United States and perhaps the best synthesis of these principles is found in *Maryland and Virginia Elder of Churches of God* v. *Church of God at Sharpsburg, Inc.* (1970), 396 U.S. 367, in which Mr. Justice Brennan, the author of the court's opinion in the *Hull Memorial* case, stated in a concurring opinion:

"We held in Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449, 89 S. Ct. 601, 606, 21 L. Ed. 2d 658 (1969), that 'First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. * * * [T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.' It follows that a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.

Thus the States may adopt the approach of Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666 (1872), and enforce the property decisions made within a church of congregational polity 'by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government,' id., at 724 and within a church of hierarchical polity by the highest authority that has ruled on the dispute at issue, unless 'express terms' in the 'instrument by which the property is held' condition the property's use or control in a specified manner. Under Watson civil courts do not inquire whether the relevant church governing body has power under religious law to control the property in question. Such a determination, unlike the identification of the governing body, frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of

power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy. In other words, the use of the Watson approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious polity.

'[N]eutral principles of law, developed for use in all property disputes,' Presbyterian Church supra, 393 U.S. 440 at 449, 89 S. Ct. at 606, provide another means for resolving litigation over religious property. Under the 'formal title' doctrine, civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws. Again, however, general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues. For example, provisions in deeds or in denomination's constitution for the reversion of local church property to the general church, if conditioned upon a finding of departure from doctrine, could not be civilly enforced." (footnotes omitted)

One additional decision must be mentioned. In *Gonzalez* v. *Archbishop of the Philippines* (1929), 280 U.S. 1, Mr. Justice Brandies stated: "In the absence of fraud, collusion, or arbitrariness, the decision of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before secular courts as conclusive. . . ." This area of determination was expressly retained in *Hull Memorial* case. However, in this case there was no contention in the trial court by any of the parties relating to fraud, collusion or arbitrariness.

Our Indiana Supreme Court has had the occasion to apply the *Hull Memorial* case in *Smart* v. *Indiana Yearly Conference of Wesleyan Methodist Church* (1971), 257 Ind. 17, 271 N. E.

2d 713, 715, in which Judge Givan, speaking for the court, stated:

"It is appellant's position that the appellee conference paid nothing whatever for the real estate in question and that the appellee therefore relies solely on the discipline of the church to sustain its ownership of the land. Appellants thus reason that the judgment in favor of the appellee by the trial court was in violation of the principle of law laid down in Presbyterian Church of the United States v. Mary Elizabeth Blue Hull Memorial Presbyterial Church (1969), 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 and Merryman v. Price (1970), Ind., 259 N. E. 2d 883, 22 Ind. Dec. 62. [cert. den. 92 S. Ct. 890 (1971)]

In reality it is the appellants who are relying on the discipline of the church in their attempt to establish an equitable ownership of the real estate in question. The appellee has demonstrated its ownership of property, subject only to the possibility of an equitable trust established for the benefit of another. The appellants attempt to make their case of an equitable trust by turning to the discipline of the church. As pointed out in the Presbyterian Church case, supra, and the Merryman case, supra, the civil courts will not pass upon matters of ecclesiastical discipline.

We would observe that Justice Harlan in his concurring opinion in the Presbyterian Church case correctly observes that civil courts can enforce conditional trusts if the fulfillment of the condition can be immediately ascertained without determining ecclesiastical questions."

A key sentence in the *Hull Memorial* case is "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." 89 S. Ct. at page 606.

This causes us to consider what is religious doctrine and practice. From the facts in the *Hull Memorial* case we can find a strong limitation on the civil courts in determining questions of departure from doctrine as it relates to implied trusts. Just exactly what other basis is available to a civil court from which it might find an implied

trust to exist in a church property dispute is left open. In *Sharpsburg* there is a strong suggestion that such an implied trust may not be found to exist if the resolution of the question requires consideration of doctrinal questions and an extensive inquiry into religious polity. We are not here required to decide whether the implied trust theory can be used since we reach our decision without regard to it.

The religious rites, doctrines, polity and practices of a church certainly contain as an essential part beliefs and practices in regard to the ownership of property. These beliefs are primarily religious and not secular. Frequently these beliefs are as strongly held *as religious beliefs* in regard to baptism or the sacraments. In other words, *beliefs* as to the proper method for a church to own property are frequently bound up with and intermingled in the religious rites, doctrines, polity and practices of the church.

In this case the parts of the constitution of the Mother Church and the United States and Canada Diocese relating to the ownership of property are clearly interspersed and interrelated with the other provisions relating to religious rites, doctrines, polity and practices. A cursory examination of these two constitutions clearly demonstrate that they are basically religious and not secular documents. The civil courts have been admonished to exercise great self-restraint in attempting to interpret disputes arising under such religious documents. The *Hull Memorial* and *Sharpsburg* cases frame this self-restraint in terms of First Amendment values. The civil courts may make a limited examination of religious instruments to determine the nature of the particular church organization within the meaning of *Watson* v. *Jones and Kedroff*. The civil courts tread on constitutionally impermissible grounds when they attempt to interpret the rights of parties under such religious documents. To paraphrase Mr. Justice Frankfurter in another context, the civil courts should and must restrain themselves

from involvement in an ecclesiastical thicket. The difficulties and dangers inherent in a civil court attempting to sort out what part of a church's rights, doctrines, polity and practices represent religious doctrine and what do not are well outlined in 75 Harvard L. Rev. 1142-1186 (1962).

In this case the trial court clearly went beyond the limits of the First Amendment in deciding that the Mother Church was without authority to divide the United States and Canada Diocese and create the three new dioceses. In reaching its decision the trial court had to probe deeply into the allocations of power within the church so as to decide where the religious law places control over the use of church property.

It is helpful to consider how the courts in other jurisdictions have considered this same question. In *Serbian Eastern Orthodox Church Congregation* v. *Serbian Eastern Orthodox Congregation*, 254 A. 2d 122, a case involving the same dispute as here, the court states:

". . . . under the Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church we may not on this appeal review the validity of the action of the Holy Assembly of Bishops, acting under the authority of article 16 of the constitution of the mother church, in subdividing the old diocese, and appellants make it clear in their reply brief that they are not seeking such review. Further, assuming, as the court there pointed out, that a narrow review of a specific ecclesiastical decision would be permissible under Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929), to determine whether fraud, collusion or arbitrariness appeared, the proofs here are entirely deficient in that respect."

The factual and procedural development of the decision of the Ohio Supreme Court in the *Kelemen* case, *supra,* is also pertinent. That case involved the congregation at Akron, Ohio, which was involved in a dispute similar to the one here. The Ohio Appellate Court found that the Mother Church did not have the right, without the consent of the diocese, to reorganize or change the territory of the diocese. The Su-

preme Court of Ohio affirmed and a petition for a writ of certiorari was filed in the Supreme Court of the United States. On February 24, 1969, the Supreme Court of the United States granted a writ of certiorari, vacated the judgment and remanded the case to the Supreme Court for further consideration in light of the *Hull Memorial* case. See 89 S. Ct. 849 (1969). On remand, the Supreme Court of Ohio, 256 N. E. 2d at page 216, stated:

"Briefly stated, our inquiry is: Did the Court of Appeals base its judgment, awarding possession and control of the property involved, upon consideration of whether the parties had adhered to or departed from church tenets and doctrine, or did it base its judgment upon principles of neutral law?
The answer lies in the appraisal of the findings of that court. The Court of Appeals' factual findings regarding the name, incorporation, the hierarchical form of organization, and plaintiff's claim of autonomy from the Mother Church did not require a decision involving church doctrine or tenets.

That court arrived at legal conclusions relative to the organizational relationship, powers and duties of the Mother Church concerning the appointment of a bishop for the Diocese of the United States and Canada, and the Mother Church's attempt to eliminate the diocese. While we recognize that these matters of internal church organization are chronic sources of disagreement for the parties and are frequently mentioned in the pleadings, briefs and arguments, the findings of the Court of Appeals are unnecessary and immaterial to a neutral law inquiry utilizing principles of law developed for use in all property disputes. Further, the Hull Memorial case offers the strong suggestion that civil courts cannot constitutionally determine matters of church government. In that case, the court's opinion cites with approval Kedroff v. St. Nicholas Cathedral of Russian Orthodox, Church in North America, 344 U.S. 94, at page 116, 73 S. Ct. 143, at pages 154-155, 97 L. Ed. 120, * * *

In addition, the Court of Appeals found that the members of plaintiff association have performed schismatic acts amounting to a withdrawal from the general church. The essence of this finding must lie in a judicial determination that plaintiff has acted contra to the doctrine and tenets of the church. In order to make such a finding the Court of Appeals had to examine plaintiff's activity as well as

church doctrine and tenets. The Hull Memorial case, supra, held that a jury could not make such an examination, and the viability of the principle of the Hull Memorial case commands the same judicial abstinence in the instant case.

\* \* \*

In the case at bar, we are not confronted with the problem of whether we can constitutionally order the enforcement of a determination made by an ecclesiastical tribunal. Other than the order creating the three new dioceses, the record fails to indicate an ecclesiastical tribunal's determination concerning the power of the Mother Church to eliminate the American-Canadian Diocese. The record does not illustrate that plaintiff has been ecclesiastically adjudicated to be outside the church doctrine because of the commission of certain acts. Additionally, the determination of the status of Bishop Dionisije, who was ecclesiastically adjudged defrocked, is frequently mentioned but remains unnecessary to our inquiry. Any question concerning court enforcibility of such a church determination is not before us.

All the agonies of a church controversy are discernible from a review of this case, but we are convinced by the rule of the Hull Memorial case that the civil court's role as a tribunal to bring order to church controversies is narrowly limited."

Thereafter, the Supreme Court of the United States denied certiorari, 400 U.S. 827 (1970).

It is unfortunate that the trial court did not have the *Hull Memorial, Sharpsburg, Kelemen, Serbian Eastern Orthodox Congregational* (N. J.), *Smart* and *Merryman* v. *Price* cases before it when it entered its findings and judgment in 1968.

The Appellees rely strongly on the *Serbian Orthodox Diocese v. Ocokoljich, supra,* which was decided before the *Hull Memorial* opinion in 1969 and *Sharpsburg* opinion in 1970. In *Ocokoljich* there was a basic finding that the Mother Church involved was hierarchical. With this we agree. Beyond this the Appellate Court of Illinois became involved in a civil determination of the allocation of power within the church. In doing so they went beyond the outer limits prescribed in *Hull Memorial* and *Sharpsburg.*

The documentary evidence in this case discloses that the local church in South Bend was organized as a church within the hierarchy of the Mother Church and therefore ██ those who remain loyal to the Mother Church are entitled to control and use of the property in question.

We do not deem it necessary to do so, but the same result could be reached, which we reach here, under the so-called formal title approach mentioned in the *Sharpsburg, Kelemen, Merryman* v. *Price* and *Dragelevich* cases. In this case neither the trial court nor this court are asked or required to determine the title to real estate. An injunction was sought to determine the right to control and use the property in question. The injunction was granted on a constitutionally impermissible basis and therefore cannot stand. This controversy has been thoroughly aired and we can see no basis for permitting a new trial in this case.

Therefore, this case is reversed and remanded with instruction to set aside and dissolve the injunction heretofore entered and to enter judgment for the Appellants denying relief on the Appellees' complaint for injunction.

Reversed and remanded.

Hoffman, C.J. and Staton, J., concur.

NOTE.—Reported in 280 N. E. 2d 69.