Andrew G. GRUTKA, as Bishop of the Roman Catholic Diocese of Gary, Indiana, Appellant (Plaintiff Below),

v.

Leo J. CLIFFORD, Joseph Clifford, Clarence Flitter, Clarence Ailes, Edward Gannon, individually and as members of the Board of Lay Trustees of St. Paul's Cemetery Association, Valparaiso, Indiana, St. Paul's Cemetery Endowment Association, Inc., an Indiana not-for-profit Corporation, the First National Bank of Valparaiso, Indiana, a national banking corporation, Appellees (Defendants Below).

No. 3–482A76.

Court of Appeals of Indiana, Third District.

Feb. 24, 1983.
Rehearing Denied May 6, 1983.

William J. O'Connor, O'Connor & Weigle, Hammond, for appellant.

Leo J. Clifford, Clifford, Claudon & Alexa, James H. Douglas, Douglas, Douglas & Douglas, Valparaiso, William M. Evans, Bose, McKinney & Evans, Indianapolis, for appellees.

STATON, Judge.

Bishop Grutka of the Roman Catholic Diocese of Gary, Indiana, sought to dissolve an irrevocable trust established by St. Paul's Catholic Church of Valparaiso, Indiana for the care of its cemetery. The trial court granted summary judgment in favor of the defendants, St. Paul's Cemetery Association (Association) and St. Paul's Cemetery Endowment Association (Corporation). Bishop Grutka contends that the trust is invalid because it was established without his consent. He raises three issues on appeal which we have consolidated into the determination of whether the trial court erred in granting the summary judgment and in refusing to dissolve the trust and transfer the trust funds back to St. Paul's Cemetery Association and to Pastor Charlebois, Pastor of St. Paul's Catholic Church.

We reverse and remand to the trial court for a determination of whether Bishop Grutka consented to the creation of the Corporation's trust and for further determinations consistent with this opinion.

■ Trial courts grant summary judgments pursuant to Ind.Rules of Procedure, Trial Rule 56, to terminate cases without factual dispute and which may be determined as a matter of law. Although TR. 56 helps expose spurious cases and eliminate undue burdens on litigants, the courts must exercise caution to ensure a party of his right to a fair determination of a genuine issue. Improbability of recovery by one party does not justify summary judgment for the opposition. *Bassett v. Glock* (1977), 174 Ind.App. 439, 368 N.E.2d 18, 20–21.

■ Summary judgments result when the court applies the law to undisputed facts. It may consider affidavits, depositions, admissions, interrogatories, and testimony. *Bassett, supra.* In addition, the court must consider as true the facts set forth in the opposition's affidavits and liberally construe the discovery in his favor. *Poxon v. General Motors Acceptance Corp.* (1980), Ind.App., 407 N.E.2d 1181, 1184.

On review of a grant of summary judgment this Court must determine if there exists any genuine issue of material fact and whether the law was correctly applied. *Hale v. Peabody Coal Co.* (1976), 168 Ind. App. 336, 343 N.E.2d 316, 320. Any doubt about the existence of a genuine issue of material fact must be resolved against the moving party. Moreover, even if the facts are undisputed, summary judgments are inappropriate when the evidence before the court reveals a good faith dispute as to the inferences to be drawn from those facts. *Id.*

The record reveals that St. Paul's Catholic Church of Valparaiso, Indiana, is part of the Roman Catholic Diocese of Gary, Indiana headed by Bishop Grutka. St. Paul's Catholic Church created the Cemetery Association in 1903 to care for its cemetery. The Association transferred its responsibility over St. Paul's Cemetery to the Corporation which it established in 1966. It supplied the Corporation with part of the Association's funds. Pastor Charlebois and the Association's trustees constitute the Corporation's board of directors. In 1974, the Corporation presented to Bishop Grutka a draft of a trust agreement between the Corporation and the First National Bank of Valparaiso, Indiana (trustee bank). Bishop Grutka requested several modifications to the trust agreement. However, he stipulated that even if the Corporation adopted the requested modifications, he would not guarantee his consent to the trust as required by Indiana trust law and Canon 1516(4) of the Roman Catholic Church. On May 30, 1974,

after the Corporation made modifications to the trust, it established an irrevocable trust with trustee bank to derive investment income for the care of St. Paul's cemetery.

Pastor Charlebois protested the creation of the Corporation's trust for the care of St. Paul's Cemetery. After failure to compel access to the trust records and to participate in the control of St. Paul's Cemetery, he asked Bishop Grutka to resolve the matter because Bishop Grutka was legal title holder of St. Paul's Cemetery and head of the Gary Diocese. Bishop Grutka sought at trial to dissolve the Corporation's trust, to require the trustee bank to deliver to pastor Charlebois and the Association the trust principal and income, and to require the Association and the Corporation to transfer to Pastor Charlebois their control over St. Paul's Cemetery.

In their joint affidavit accompanying their motion for summary judgment, the Association and the Corporation made three contentions. First, they asserted that the question of control over church property is an ecclesiastical matter outside secular court jurisdiction pursuant to the first amendment of the United States Constitution.[1] Second, they asserted that no genuine issues of material fact existed. Third, they asserted that the Indiana General Cemetery Act prevented any transfer of funds from the Corporation's trust.[2] The trial court granted summary judgment for the Association and the Corporation.

Bishop Grutka contends on appeal that his position as head of the Gary Diocese gives him the authority to require the Association and the Corporation to dissolve the Corporation's trust. All parties agree that as the head of the Gary Diocese, Bishop Grutka is the legal title holder and trustee of St. Paul's Cemetery. Bishop Grutka contends that his status as legal title holder of St. Paul's Cemetery requires the Corporation to obtain his consent for the valid

creation of an irrevocable trust for the care of St. Paul's Cemetery. Under these two theories, he urged the trial court to dissolve the Corporation's trust and to require the Corporation and the Association to transfer to Pastor Charlebois control over St. Paul's Cemetery. He asserted that these two theories establish him as the hierarchial authority over the Corporation and the Association. These theories are commonly known as the Neutral Principles of Law Approach and the Polity Analysis.

■ The Association and the Corporation assert that the determination of Bishop Grutka's authority over St. Paul's Cemetery is an ecclesiastical matter outside the scope of secular review pursuant to the first amendment of the United States Constitution. Application of the Neutral Principles of Law Approach and the Polity Analysis indicates a contrary result. Because each theory reveals that the determination of Bishop Grutka's authority over St. Paul's Cemetery requires no interpretation of ecclesiastical matters, the first amendment does not proscribe our resolution of this church property dispute. *Jones v. Wolf* (1978), 443 U.S. 595, 604, 99 S.Ct. 3020, 3026, 61 L.Ed.2d 775. Therefore, we will first use the Neutral Principles of Law Approach to determine whether the trial court can dissolve the Corporation's trust. Second, application of the Polity Analysis will determine whether the trial court must require the Association and the Corporation to transfer to Pastor Charlebois their control over St. Paul's Cemetery.

■ The State has a legitimate interest in providing civil forums for resolution of church property disputes. *Jones, supra* at 602, 99 S.Ct. at 3024–25; *Presbyterian Church of the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church* (1969), 393 U.S. 440, 445, 89 S.Ct. 601, 604, 21 L.Ed.2d 658; *Marich v. Kragulac* (1981), Ind.App., 415 N.E.2d 91, 96. The

1. "Religious and political freedom.—Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the

people peaceably to assemble, and to petition the government for a redress of grievances." *U.S. Const.* amend. I.

2. IC 1974, 23–14–1–(1–29) (Burns Code Ed.).

first amendment of the United States Constitution only proscribes secular resolution of those church property disputes which necessitate interpretation of ecclesiastical matters. *Jones, supra* 443 U.S. at 602, 99 S.Ct. at 3024–25; *Hull Memorial, supra* 393 U.S. at 449, 89 S.Ct. at 606; *Marich, supra* at 96; *United Methodist Church v. St. Louis Crossing Independent Methodist Church* (1971), 150 Ind.App. 574, 580–81, 276 N.E.2d 916, 920. Indiana defines ecclesiastical matters as those matters which concern

> "doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church."

*St. Louis Crossing, supra* at 920, citing *Olear v. Haniak* (1939), 235 Mo.App. 249, 131 S.W.2d 375, 380–381; *Western Conf. of Original Free Will Baptists v. Miles* (1963), 259 N.C. 1, 129 S.E.2d 600, 606. However, the first amendment allows the courts freedom of analytical approach when a church matter is properly before them. *Hull Memorial, supra* 393 U.S. at 449, 89 S.Ct. at 606; *Marich, supra* at 98; *St. Louis Crossing, supra* at 921.

▮▮▮ Recently, this Court applied the Neutral Principles of Law Approach to resolve church property disputes. *Marich, supra; Draskovich v. Pasalich* (1972), 151 Ind.App. 397, 411–414, 280 N.E.2d 69, 77–79. The policy of the Neutral Principles of Law Approach is to allow secular courts to resolve church property disputes without violating the first amendment's prohibition of interpreting religious documents.[3] The Neutral Principles of Law Approach requires courts to examine certain documents for language of a trust in favor of the General Church. *Jones, supra* 443 U.S. at 604–605, 99 S.Ct. at 3025–26; *Marich, supra* at 101; *St. Louis Crossing, supra* at 921. The documents to be examined include civil statutes, the express language of deeds, local church charters, and general church constitutions. *Jones, supra; Marich, supra; St. Louis Crossing, supra.* The United States Supreme Court has outlined how closely courts may examine these religious documents:

> "In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body."

*Jones, supra* at 604, 99 S.Ct. at 3026; *Serbian Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151.

---

3. "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members."
*Jones v. Wolf* (1978), 443 U.S. 595, 603, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775.

■ The Association and the Corporation rely on *Draskovich, supra,* to support their contention that the trial court lacked jurisdiction over this church property dispute. We fail to see how *Draskovich* supports the Association and the Corporation in this case. In *Draskovich,* a local church congregation, split over loyalties between the Mother Church and a defrocked Bishop, litigated a dispute over the control of the local church property. This Court held that

"[religious] *beliefs* as to the proper method for a church to own property are frequently bound up with and intermingled in the religious rites, doctrines, polity and practices of the church.

In this case the parts of the constitution of the Mother Church and the United States and Canada Diocese relating to the ownership of property are clearly interspersed and interrelated with the other provisions relating to religious rites, doctrines, polity and practices."

*Id.* at 78–79. Because the terms in the church constitutions regarding property ownership were intermingled with religious concepts, this Court found that the trial court had to "probe deeply" into church documents to determine who controlled the church property. *Id.* at 77 and 79. Clearly, the first amendment prohibits this. *Id.* The prohibition against "probing deeply" into church documents means that courts can not interpret ecclesiastical matters within church documents when determining control of church property. *Id.* We see no difference between "probing deeply" and "interpretation." *Id; See Jones, supra* 443 U.S. at 604, 99 S.Ct. at 3026. Therefore, *Draskovich* does not alter the general rule that we can examine church documents to determine who has control of church property as long as we do not interpret ecclesiastical matters. *Jones, supra* at 604, 99 S.Ct. at 3026; *Draskovich, supra* at 77.

The Neutral Principles of Law Approach can be applied to determine whether the Corporation made a valid trust. All parties agree that Bishop Grutka as the current head of the Gary Diocese is the trustee of St. Paul's Cemetery. Therefore, the trust that was later created by the Corporation is a second trust of St. Paul's Cemetery. Whether the second trust created by the Corporation is a valid trust does not require any interpretation of ecclesiastical matters.

■ There are two ways to create a valid second trust. Either all of the beneficiaries of the initial trust can make a second trust of their equitable interest, or the trustee of the initial trust may consent to the creation of a second trust. *Buhl v. Kavanagh* (6th Cir.1941), 118 F.2d 315, 320; *Hord v. Bradbury* (1901), 156 Ind. 20, 59 N.E. 27; *Rottger v. First Merchants National Bank of Lafayette* (1933), 98 Ind.App. 139, 184 N.E. 267. The Corporation must have used one of these methods to create a valid second trust over St. Paul's Cemetery.

■ A valid second trust of the equitable interest in the initial trust over St. Paul's Cemetery can be made only by all of the beneficiaries of the initial trust. *Buhl, supra.* Thus, we must determine the beneficiaries of the initial trust over St. Paul's Cemetery. Although we have never applied the Neutral Principles of Law Approach to determine the beneficiaries of a trust, we do so here because such application does not circumvent its policy as long as we refrain from interpreting ecclesiastical matters within the church documents.[4] The Association's rules and regulations are among the church documents which we can examine to resolve this church property dispute.[5] Article 12 of the Association's rules

---

4. *See supra* note 3. This Court has consistently applied the Neutral Principles of Law Approach to find language evidencing an implied trust in favor of the General Church. *Marich, supra; Draskovich, supra; St. Louis Crossing, supra.* Here, the pleadings make it unnecessary for us to search for such trust language. In their answer, the Corporation and the Asso-

ciation stated that Bishop Grutka holds St. Paul's Cemetery in trust.

5. In fact, the Indiana Supreme Court stated that:

"It is the law in this state and in this country generally that the ecclesiastical rules and regulations of any church organization shall be controlling upon the members of the

and regulations clearly states, without interpretation, that the beneficiaries of St. Paul's Cemetery are all Catholics who desire and are granted a burial plot therein.[6] Because St. Paul's members may not be the exclusive beneficiaries of the St. Paul Cemetery plots held in trust by Bishop Grutka, their local Corporation can not create a second trust under Indiana trust law. *Id.*

 Having found that all of the beneficiaries could not have created a second trust in their equitable interest, the Corporation could only create a second valid trust over St. Paul's Cemetery through the consent of Bishop Grutka, trustee of the initial trust. It is undisputed that Bishop Grutka is legal title holder and trustee of St. Paul's Cemetery. As trustee of St.

Paul's Cemetery, Bishop Grutka is responsible to provide a well-maintained cemetery to ensure that the Association and the Corporation do not limit the cemetery plots to only St. Paul's members and that only true Catholics are buried therein.[7] In addition to the Association's rules and regulations which set forth these responsibilities for Bishop Grutka, Canon 1516(4) of the Roman Catholic Church stipulates that Bishop Grutka's consent is required for church investments.[8] Thus, civil law and church documents make it clear that the Corporation could have created a valid second trust only if it had first acquired Bishop Grutka's consent. We do not know whether Bishop Grutka consented to the Corporation's trust;[9] this is a question for the trier of

---

organization, and will be given full effect by the civil courts so long as they are reasonable and not inconsistent with, or repugnant to, the civil laws."

*Kompier v. Thegza* (1938), 213 Ind. 542, 13 N.E.2d 229, 231.

6. St. Paul's Catholic Church Cemetery Association's rules and regulations, art. 12:

"Article 12
"The facilities of St. Paul's Cemetery are principally intended for Catholics living in the Valparaiso, Indiana, area. If, for reasons of sentiment, non-residents desire to purchase burial space, they may tender their application in writing to the association and said association reserves the right to accept or reject the same. The term 'Valparaiso, Indiana, area' is intended to mean the area within the jurisdiction of the Reverend Pastor or Administrator of St. Paul's Catholic Church of Valparaiso, Indiana."

7. St. Paul's Catholic Church Cemetery Association's rules and regulations, art. 2, 3, 4, 5, and 22:

"Article 2
"This association exists for the purpose of operating St. Paul's Cemetery in a most satisfactory manner and with respect and reverence which such hallowed ground requires. Said cemetery is situated on old State Road 49 southeast of the City of Valparaiso, Indiana, consisting of 10½ acres located in Section 30, Township 35, Range 5 West, the title of which is in the name of the Bishop of the Diocese of Gary, Indiana.

"Article 3
"Civil law shall have no right to interfere with the operation of this cemetery association especially with regard to the interment of a person who is not entitled to Christian burial.

"Article 4
"No interment shall be made contrary to the regulations of the Roman Catholic Diocese of Gary, Indiana, and no interment shall be made without the approval of a Roman Catholic Priest.

"Article 5
"In case of major controversy, the decision of the Most Reverend Bishop of the Diocese of "Gary, Indiana, or his delegate, shall be final, and no appeal from any such decision may be taken to the civil courts."

\* \* \* \* \* \*

"Article 22
"Purchasers of property in St. Paul's Cemetery shall, at the time the purchase price is paid in full, receive a certificate of ownership entitling them to the perpetual holding and use of said property for the burial of the dead, subject to the rules and regulations of the cemetery, the discipline of the Catholic church, and the laws of the Diocese of Gary, Indiana, now in force or that may hereafter be adopted; . . ."

8. *See supra* note 6; Code of Canon Law of the Roman Catholic Church (Codex Juris Canonici), Canon 1516(4):

"1516. As the administrators are bound to fulfill their office with the solicitude of a good father of a family, they shall: . . .
"(4) invest the surplus revenue of a church, with the consent of the Ordinary, to the benefit of the church; . . ."

The "Ordinary" referred to in Canon 1516(4) above is another name for the Bishop of the Diocese.

9. Even if Bishop Grutka had expressly delegated to the Corporation his power over St. Paul's Cemetery, the Corporation would not have the

fact.[10]

Because the trial court can dissolve the Corporation's trust if Bishop Grutka did not consent, we apply the Polity Analysis to determine whether the trial court must enforce Bishop Grutka's order which requires the transfer of control over St. Paul's Cemetery to Pastor Charlebois. We have previously applied this analysis in cases where we can determine the proper church-governing body without interpretation of ecclesiastical matters. *Marich, supra* at 98; *Draskovich, supra* at 77. The Polity Analysis requires three steps to determine who controls St. Paul's Cemetery. *Marich, supra* at 98; *Bernson v. Koch* (1975), 35 Colo. App. 257, 534 P.2d 334.

 The first step that must be made in the analysis is whether the Catholic Church is hierarchial or congregational. Because there is no dispute that St. Paul's Catholic Church is part of a hierarchial denomination, we can go to the second and third steps of this analysis. The second step is for us to determine whether St. Paul's Catholic Church and its organizations are subject to the direction of the hierarchy. Articles 2, 3, 4, 5, and 22 of the Association's rules and regulations clearly establish, without interpretation, that Bishop Grutka's decisions are final.[11] The third step under this Polity Analysis is determining the legitimate source of control over the Association and the Corporation. In addition to the above-mentioned articles, Canon 1516(4) of the Roman Catholic Church establishes Bishop Grutka as the legitimate

source of control over St. Paul's Cemetery.[12] Thus, the Polity Analysis requires the trial court to enforce Bishop Grutka's orders because he is the hierarchial authority. *Marich, supra* at 98. Therefore, if the trier of fact finds that Bishop Grutka did not consent to the Corporation's trust, the trial court must enforce his orders to dissolve the Corporation's trust and to transfer control to Pastor Charlebois. *Id; see also Jones, supra* 443 U.S. at 604–605, 99 S.Ct. at 3026.

The last basis upon which the trial court could have granted summary judgment is the Indiana General Cemetery Act (Cemetery Act). IC 1974, 23–14–1–(1–29) (Burns Code Ed.). In their affidavit in support of their motion for summary judgment, the Association and the Corporation asserted that pursuant to section 12 of the Cemetery Act, Bishop Grutka must set up and maintain a perpetual trust fund for the benefit of St. Paul's Cemetery. The pertinent part of section 12 requires cemetery owners to ensure cemetery maintenance by setting up a perpetual trust fund:

> "The owner of every cemetery shall provide for the creation and establishment of an irrevocable perpetual care fund, the principal of which shall permanently remain intact except as hereinafter provided and the income only thereof shall be devoted to the perpetual care of said cemetery and which principal shall be known as the 'perpetual care fund' or 'endowment care fund' of such cemetery."

IC 1974, 23–14–1–12 (Burns Code Ed.). The Association and the Corporation further as-

---

power to create a second valid trust without his consent. *Hord v. Bradbury* (1900), 156 Ind. 20, 59 N.E. 27.

10. If Bishop Grutka consented to the creation of the Corporation's trust, and if the trust is otherwise valid under Indiana trust law, it still may be revocable. For a valid trust to be revocable, the settlor must have inserted a revocation clause. IC 1974, 30–1–9–17 (Burns Code Ed., 1982 Supp.); *Hinds v. McNair* (1980), Ind.App., 413 N.E.2d 586, 594; *Rottger, supra; Terre Haute Trust Co. v. Scott* (1932), 94 Ind. App. 461, 181 N.E. 369. However, equity allows reformation of the trust to insert a revocation clause if it was fraudulently or mistakenly omitted by the person preparing the trust for

the settlor. *Colbo v. Buyer* (1956), 235 Ind. 518, 134 N.E.2d 45, 50–51. Bishop Grutka did request that several modifications be made to the trust. The Corporation made several changes which did not include the insertion of a revocation clause. If the Bishop operated under mistake as to the law which requires such a clause, equity allows its insertion. *Id.* However, acting upon advice of counsel does not permit the insertion of a revocation clause. *Id.* Therefore, the trial court may or may not be able to dissolve the Corporation's trust.

11. *See supra,* notes 7 and 8.

12. *See supra,* note 8.

serted that because the Corporation created its trust to comply with section 12, the trial court can not dissolve the Corporation's trust or require the trustee bank to deliver to Pastor Charlebois and the Association the trust principal and income.

■ Bishop Grutka contends that section 2 of the Cemetery Act exempts St. Paul's Cemetery from the section 12 perpetual trust fund requirements. We agree. Section 2 reads in its entirety:

"23–14–1–2 [21–1002]. Exceptions.— The provisions of this act [23–14–1–1— 23–14–1–29] shall apply to all cemeteries, community or public mausoleums and columbaria within the state of Indiana except as hereinafter provided. Cemeteries owned by a municipal corporation, or other governmental unit, religious cemeteries and cemeteries of ten [10] acres or less in size which are owned and operated entirely and exclusively by existing nonprofit mutual associations and in which burials have heretofore taken place, shall be exempt from section [sections] 12 to 17 [23–14–1–12—23–14–1–19], inclusive, of this act; Provided, however, That whenever any such cemetery owned and operated by a non-profit mutual association, directly or indirectly, constructs or permits to be constructed any structure, above or below ground, interment rights in which are offered for sale to the general public, and/or acquires additional land, or an interest therein, causing said cemetery with said addition to exceed ten [10] acres in size, the provisions of this act shall then and thereafter apply to the whole of said cemetery. [Acts 1939, ch. 142, § 2, p. 679; 1953, ch. 68, § 2, p. 216; 1955, ch. 143, § 1, p. 286; 1965, ch. 335, § 2, p. 970.]"

IC 1974, 23–14–1–2 (Burns Code Ed.). This section exempts religious cemeteries from the perpetual trust fund requirements in sections 12–17.[13] Because religious ceme-

---

13. "23–14–1–12 [21–1012]. Perpetual care or endowment care fund.—The owner of every cemetery shall provide for the creation and establishment of an irrevocable perpetual care fund, the principal of which shall permanently remain intact except as hereinafter provided and the income only thereof shall be devoted to the perpetual care of said cemetery and which principal shall be known as the 'perpetual care fund' or 'endowment care fund' of such cemetery. This fund shall be created and established as follows:

"(a) In respect to a cemetery for earth burials, by the application and payment thereto of an amount equivalent to a minimum of fifteen per cent [15%] of the sale price, or forty cents [40¢] per square foot, of ground interment rights sold, whichever is greater;

"(b) In respect to a community or public mausoleum by the application and payment thereto of an amount equivalent to a minimum of eight per cent [8%] of the sale price or fifty dollars [$50.00] per crypt sold, whichever is greater;

"(c) In respect to a community columbarium, by the application and payment thereto, of an amount equivalent to a minimum of ten dollars [$10.00] per niche sold.

"From the sale price, or any payment thereon, said owner shall pay an amount in proportion to the foregoing requirements, to the said care fund, which said payment shall be in cash and shall be deposited with the custodian or trustee of said fund not later than thirty [30] days after the close of the month in which payments on said sale are received.

"In addition to the above, any cemetery organized after the effective date of this amendment, whether it be by incorporation, association, individually or by any other means, or having its first burial after the effective date [August 18, 1953] of this amendment, shall, before disposing of any burial lot or right or making any sale thereof, and/or making its first burial, cause to be deposited in a bank, a bank and trust company, trust company, or national bank having and maintaining a principal place of business within the state of Indiana, and having fiduciary powers, the sum of twenty-five thousand dollars [$25,000] in cash in the perpetual care fund or endowment care fund established as required by paragraph 1 of this section, for the maintenance of said cemetery and shall designate such banking institution as trustee of such fund. Said banking institution shall execute an affidavit stating that it has accepted the trusteeship of said fund and that said twenty-five thousand dollars [$25,000] has been deposited as provided therein. Said affidavit shall be exhibited in the principal office of said cemetery and shall at all times be available for examination, and be recorded in the miscellaneous records in the office of the county recorder in the county where such cemetery is located.

"Whenever the cemetery shall have deposited in the perpetual care fund or endowment care fund, as required by this section, a sum amounting to fifty thousand dollars [$50,000]

it shall submit proof of such fact to its said trustee and it shall be the duty of said trustee to thereupon pay over to said cemetery the amount of twenty-five thousand dollars [$25,000] so originally deposited by it in the said care fund.

"Such perpetual care or endowment care funds may be increased by adding thereto surplus money or property received by will, deed, gift or otherwise.

"The custodian of the perpetual care or endowment care funds of every cemetery to which the provisions of this act are applicable, shall on or before March 31 of each calendar year, prepare and file with the owner of the cemetery a detailed accounting and report of such funds for the calendar year ending the preceding December 31, which shall include, among other things, properly itemized, the securities in which the same are then invested, which accounting and report shall be at all times available to inspection and copy by any owner of a burial right in the cemetery at the usual place for transacting the regular business of the cemetery.

"Within sixty [60] days after the receipt of such accounting and report the owner of the cemetery shall file a certified copy thereof with the clerk of the circuit court of the county in which said cemetery is located, and which report shall be open to inspection of any person interested therein.

"Each geographic location shall constitute a separate and distinct cemetery for the purpose of interpretation and application of this section. [Acts 1939, ch. 142, § 12, p. 679; 1953, ch. 68, § 5, p. 216; 1959, ch. 298, § 1, p. 753; 1965, ch. 335, § 6, p. 970.]"

"23–14–1–13 [21–1029]. Installation of commodities—Rules and regulations—Service charge.—All cemetery owners shall have the right to establish reasonable rules and regulations regarding the type, material, design, composition, and finish of any and all commodities to be used or installed in the cemetery. No cemetery owner shall have the right to prevent the use of or installation of any commodity purchased from any source, provided it meets these rules; and the charges for services in connection with the installation or use of these commodities shall be the same to all regardless of who furnishes them, however the cemetery owner may hold to himself the exclusive right to furnish these services in said cemetery. All cemetery owners shall have a full and complete schedule of all charges for services plainly printed or typewritten and maintained subject to inspection and copy at the usual place for transacting the regular business of the cemetery. [Acts 1939, ch. 142, § 12B, as added by Acts 1959, ch. 298, § 2, p. 753.]" (Annotations omitted.)

"23–14–1–14 [21–1030]. Proceeds from sale of vaults or memorials placed in escrow or trust.—All proceeds received by anyone selling vaults, memorials of all types, floral tributes, or services to be installed in or provided in a cemetery which said merchandise and services are not to be delivered or provided until the death of the person or persons for whom it is to be used or provided, shall be placed in escrow or trust in a separate account. Said proceeds shall be held in escrow or trust for the specific purpose intended until the time of burial or completion of the services. The proceeds from the sales of burial spaces are specifically exempt from this provision. [Acts 1939, ch. 142, § 12C, as added by Acts 1959, ch. 298, § 4, p. 753.]"

"23–14–1–15 [21–1013]. Perpetual care fund—Donations to—Legalizing.—The accumulation and holding of the funds as authorized by sections 12 [23–14–1–12] and 18 [23–14–1–20] of this act, or contributions thereto, are and each thereof is hereby expressly permitted and shall be and be deemed to be for a charitable and eleemosynary purpose. Such funds and contribution shall be deemed to be a provision for the discharge of a duty due from the person or persons contributing thereto to the person or persons interred in the cemetery and to the persons whose remains will be interred therein, and likewise a provision for the benefit and protection of the public by preserving, beautifying and keeping cemeteries from becoming places of reproach and desolation in the communities in which they are situated. No payment, gift, grant, bequest or other contribution for such purpose shall be or be deemed to be invalid by reason of any indefiniteness or uncertainty of the persons designated as beneficiaries in the instruments creating said fund, nor shall said fund or any contribution thereto be or be deemed to be invalid as violating any law against perpetuities or the suspension of the power of alienation of title to property. [Acts 1939, ch. 142, § 13, p. 679.]"

"23–14–1–16 [21–1014]. Exception from Trustees' Accounting Act.—In the event any gift, grant, bequest, donation or other property held by the owner of any cemetery for cemetery purposes shall be so held by such owner as a trust of any kind, or in the event the owner of any cemetery is a beneficiary of any trust estate for cemetery purposes, then the trustee of each such trust is hereby relieved of the duties otherwise imposed upon the trustee by the Uniform Trustees' Accounting Act of the state of Indiana. [Acts 1939, ch. 142, § 14, p. 679.]"

"23–14–1–17 [21–1015]. False and fraudulent representations.—Penalty.—A person who makes any false or fraudulent representation as to the existence, amount, investment, control, or condition of any perpetual care fund of any cemetery, for the purpose of inducing another to purchase any burial right, commits a class C infraction. [Acts 1939, ch. 142, § 15, p. 679; 1978, P.L. 2, § 2312, p. 2.]"

teries like St. Paul's are exempt, the allegations of the Association and the Corporation are without merit.

Reversed and remanded for a determination of whether Bishop Grutka consented to the creation of the Corporation's trust and for further determinations consistent with this opinion.

HOFFMAN, P.J., concurs.

GARRARD, J., concurs and dissents with opinion.

GARRARD, Judge, concurring in part and dissenting in part.

I agree with the majority's determination that the operation of the cemetery is exempt from the requirements of IC 23–14–1–12.

I do not agree, however, with the majority's general statement that a "second" trust can be created merely upon or by the consent of the trustee, nor do I believe the cases relied upon may be fairly read to stand for that proposition.

It is admitted that the Bishop holds legal title and that he does so as trustee. It appears under canon law that his consent is required to permit such a trust as that created here. It separately appears that there is a requirement that funds belonging to the church may only be invested in a certain manner. The materials before the court appear to establish that the Bishop agreed to "tolerate" the trust if certain conditions were met. It is manifest from the very initiation of this lawsuit that the Bishop was, in any event, attempting to revoke any permission theretofore granted or implied.

The resolution of these questions requires proper interpretation of the authority of the Bishop under the circumstances. I believe that such authority cannot be resolved without delving into ecclesiastical questions to an extent prohibited by the first and fourteenth amendments according to *Jones v. Wolf* (1979), 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775.

The Bishop seeks to avoid the consequences of that conclusion by asserting that the rules of the association, itself, require it to be bound by his determinations. Neither the trust agreement with the bank nor the articles of incorporation of St. Paul's Cemetery Endowment Association, Inc. contain any such requirement. The rules and regulations of the association provide in part that "In case of major controversy, the decision of the Most Reverend Bishop ... shall be final, ...." but taken in context the provision appears to refer to questions concerning interment of individuals.

It therefore appears to me that resolution of the questions posed requires the interpretation and application of ecclesiastical law and we may not through the use of neutral principles of law decide the case.

I would therefore affirm the dismissal of the action.