ATTORNEYS FOR APPELLANTS
Judy L. Woods
Bose, McKinney & Evans, LLP
Indianapolis, Indiana

Ross E. Rudolph
Rudolph, Fine, Porter, & Johnson, LLP
Evansville, Indiana

ATTORNEY FOR APPELLEE
Brian P. Williams
Kahn, Deels, Donovan, &
Kahn, LLP
Evansville, Indiana

ATTORNEY FOR AMICUS CURIAE
AMERICAN ANGLICAN COUNCIL
John C. Duffey
Stuart & Branigin, LLP
Lafayette, Indiana

ATTORNEYS FOR AMICUS CURIAE
PRESBYTERIAN LAY COMMITTEE
David E. Gray
Paul E. Black
Bowers Harrison, LLP
Evansville, Indiana

Forrest Norman
Cleveland, Ohio

FILED
Jul 31 2012, 11:17 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 82S02-1105-MF-314

THE PRESBYTERY OF OHIO VALLEY, INC., D/B/A THE PRESBYTERY OF OHIO VALLEY, D/B/A OHIO
     VALLEY PRESBYTERY, AND
THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.), INC., D/B/A THE SYNOD
     OF LINCOLN TRAILS, INC.,

*Appellants (Plaintiffs below),*

v.

OPC, INC., F/K/A OLIVET PRESBYTERIAN CHURCH, INC., D/B/A OLIVET PRESBYTERIAN CHURCH,
     D/B/A OLIVET EVANGELICAL PRESBYTERIAN CHURCH, D/B/A OLIVET PRESBYTERIAN
     CHURCH OF EVANSVILLE, AND
OLIVET EVANGELICAL PRESBYTERIAN CHURCH OF EVANSVILLE, INC., AND
THE EVANGELICAL PRESBYTERIAN CHURCH, D/B/A EVANGELICAL PRESBYTERIAN CHURCH OF
     AMERICA,

*Appellees (Defendants below).*

Appeal from the Vanderburgh Circuit Court, No. 82C01-0707-MF-343
The Honorable Carl D. Heldt, Judge

On Transfer from the Indiana Court of Appeals, No. 82A02-1003-MF-339

**July 31, 2012**

**Dickson, Chief Justice.**


This case involves a property dispute between an individual church congregation, the Olivet Presbyterian Church ("Olivet"),[1] and the denominational organization with which it was previously affiliated, the Presbyterian Church (U.S.A.) ("PC(USA)"), and the latter's subsidiary organizations, the plaintiffs in this action—the Presbytery of Ohio Valley and the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), Inc. (collectively, "Presbytery").[2] The trial court granted summary judgment rejecting the Presbytery's claims of express and implied trust and holding that the disputed property is solely owned by Olivet. The Presbytery appealed both the denial of its motion for summary judgment and the granting of Olivet's motion. The Court of Appeals reversed the trial court and granted summary judgment in favor of the Presbytery. Presbytery of Ohio Valley, Inc. v. OPC, Inc., 940 N.E.2d 1188, 1197 (Ind. Ct. App. 2010). We granted transfer, thereby vacating the opinion of the Court of Appeals. Ind. App. R. 58(A)(2). We hold that genuine issues of material fact arise from the inferences flowing from the stipulated designated evidence and that neither Olivet nor the Presbytery is entitled to the full relief sought in their respective motions for summary judgment.

---

[1] The first and second named defendants, for purposes of this case, both constitute the congregation of Olivet. During the course of Olivet's separation from the PC(USA), Olivet amended its articles of incorporation and became known as "OPC, Inc." Stipulated Statement of Facts ¶ 11. Olivet then formed a second corporation, "Olivet Evangelical Presbyterian Church of Evansville, Inc." *Id.* ¶ 12. The two entities then merged. *Id.* ¶ 13. The third named defendant, the Evangelical Presbyterian Church, is the denominational organization with which Olivet is now affiliated. *Id.* ¶ 14. The Evangelical Presbyterian Church remains a named party to this suit but "claims it has no beneficial or legal interest in the Property at issue in this dispute." *Id.* ¶ 16.

[2] In the PC(USA) there are four governing bodies or "judicatories," and each is answerable the next highest body. Book of Order: 2005–2007 §§ G-4.0301, G-9.0101, G-9.0103 (2005). These bodies, in ascending order, are the session, the presbytery, the synod, and the General Assembly. *Id.* § G-9.0101. A local church (or "particular church") is governed by its session, which consists of the church's ministers and elders elected by the congregation. *Id.* §§ G-7.0103, G-10.0101. A presbytery then consists of "all the churches and ministers . . . within a certain district," as well as at least one elder from each session within the district. *Id.* § G-11.0101 (endnote omitted). A synod oversees three or more presbyteries in a specified geographic region and consists of "commissioners elected by the presbyteries." *Id.* § G-12.0101. The General Assembly is the highest judicatory "and is representative of the unity of the synods, presbyteries, sessions, and congregations of the [PC(USA)]." *Id.* § G-13.0101. It meets annually and is composed of a number of elders and ministers elected by each presbytery proportional to each presbytery's membership. *Id.* § G-13.0102.

2

Olivet, formerly the Olivet Presbyterian Church of Evansville and the Olive Street Presbyterian Church, was affiliated in 1900 with an ancestor of the current PC(USA), which was not formed until the early 1980s when the United Presbyterian Church in the U.S.A. combined with the Presbyterian Church of the United States to become the PC(USA).[3] In 1968, Olivet acquired the real estate and built its church building using its own resources. Beginning at least as far back as 1994, the Olivet congregation began to have doctrinal disputes with the PC(USA), "including disputes about church policies and positions on abortion, ordination, Christology and theology." Stipulated Statement of Facts ¶ 50 [hereinafter Stip. Facts]. Olivet in 2006 (with a 98% approval vote of its congregation) decided to disassociate from the PC(USA) when the General Assembly of the PC(USA) was considering substantial alterations to its denominational policy and religious doctrine, among them: "1) the deity of Christ, 2) the essentials of salvation, and 3) the Bible as the infallible word of God." Stipulated Documentary R. 48 [hereinafter Stip. Ex.]. In response, the PC(USA), through its Presbytery, offered to "release" Olivet from membership in the PC(USA) on condition that, while negotiations continue regarding "the issue of the disposition of the church and its real property," Olivet must agree to treat the building as leased from the Presbytery for eight months and pay $1.00 as lease consideration and, if a settlement is not agreed, then for up to one more year "at the current market value for such space in Evansville, Indiana." Stip. Ex. 61. Olivet did not accept this proposal.

When Olivet declined to relinquish ownership of its church property, the Presbytery filed this action claiming a trust on Olivet's property in favor of the PC(USA) and seeking a declaratory judgment divesting Olivet from all right, title, and interest in its property. As explained by the trial court, the "PC(USA) seeks through this litigation to take control of the building and real property at 5600 Oak Hill Road as well as the congregation bank accounts and any other property." Entry of Final Judgment with Findings of Fact and Conclusions of Law, Appellants' App'x at 13–14.[4] The trial court, faced with competing motions for summary judgment, determined

---

[3] The general history of Presbyterianism in the United States is replete with numerous splits and reunifications. *See* Stipulated Statement of Facts n.7 (referring the Court to the website of the Presbyterian Historical Society); Family Tree of Presbyterian Denominations, Presbyterian Historical Society, The National Archives of the PC(USA), http://www.history.pcusa.org/history/denominations.cfm (last visited July 19, 2012) (appended as Attachment A).

[4] The trial court's decision, titled "Entry of Final Judgment with Findings of Fact and Conclusions of Law," does not refer to summary judgment. After the trial court noted that the summary judgment mo-

that the property belonged exclusively to Olivet; that the Presbytery, its associated plaintiff, and the PC(USA) had no rights in the property; that the property was not held in trust—expressly, impliedly, or constructively—in favor of the PC(USA) or its associated entities, the plaintiffs; and that Olivet had not been unjustly enriched nor had it converted property belonging to the PC(USA) or the plaintiffs. The Presbytery instituted this appeal requesting both the entry of summary judgment in its favor and reversal of the trial court's judgment for Olivet. Additional facts will be provided as needed.

## 1. Neutral Principles of Law

As a general matter, it is clear that Indiana courts have subject-matter jurisdiction over Indiana church-property disputes. Ramsey v. Hicks, 174 Ind. 428, 431, 91 N.E. 344, 346 (1910); *see also* Jones v. Wolf, 443 U.S. 595, 602, 99 S. Ct. 3020, 3024–25, 61 L. Ed. 2d 775, 783–84 (1979) ("There can be little doubt about the general authority of civil courts to resolve [church property] question[s]. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively."). However, "'the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes'" and "prohibit[s] civil courts from resolving church property disputes on the basis of religious doctrine and practice." Jones, 443 U.S. at 602, 99 S. Ct. at 3025, 61 L. Ed. 2d at 784 (quoting Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449, 89 S. Ct. 601, 606, 21 L. Ed. 2d 658, 665 (1969) [hereinafter Hull]). The U.S. Supreme Court has declined to adopt a "particular method" for states to follow in resolving church property disputes. *Id.* Rather, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* (quoting Md. & Va. Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 368, 90 S. Ct. 499, 500, 24 L. Ed. 2d 582, 584 (1970) [hereinaf-

---

tions were being taken under advisement, the parties each filed proposed entries of final judgment with findings of fact and conclusions of law. The trial court's "Final Judgment" resulted. It is clear, however, that the relief sought by the parties was entry of summary judgment and that is the relief requested by the Presbytery on appeal, we thus address only the question of whether summary judgment is appropriate and apply the summary judgment standard of review.

ter <u>Sharpsburg II</u>] (Brennan, J., concurring)) (internal quotation marks omitted).

The parties dispute which method Indiana courts should apply in such cases. The Presbytery contends that the "preferred" approach is the polity approach (also termed the "hierarchical deference rule") enunciated by the Supreme Court in <u>Watson v. Jones</u>, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871). Appellants' Br. at 13–15. Olivet contends that the better method is the neutral-principles-of-law approach which was approved by the Supreme Court in <u>Jones v. Wolf</u>, 443 U.S. at 602–04, 99 S. Ct. at 3025–26, 61 L. Ed. 2d at 784–85. We agree with Olivet.

The polity approach was developed by the Supreme Court to settle a property dispute resulting from a schism in a local church. *See* <u>Watson</u>, 80 U.S. (13 Wall.) at 726–27, 20 L. Ed. at 676. Rejecting the "English" rule, which required inquiry into the "true standard of faith in the church organization" and then into which schismatic faction was most loyal to that standard, the Court determined that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest . . . church judicatories . . . , the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* at 727, 20 L. Ed. at 676. The polity approach first inquires into the organizational structure of the denomination and, if found to be "hierarchical,"[5] requires the civil courts to defer to the determination of the denominational church organization. *Id.* This amounts to a "rule of compulsory deference to religious authority in resolving church property disputes." <u>Jones</u>, 443 U.S. at 605, 99 S. Ct. at 3026, 61 L. Ed. 2d at 786 (responding to the dissenters contention that states should be required to apply <u>Watson</u> in all cases). As the Court noted in <u>Jones</u>, in some instances "this task would not prove to be difficult," but in others such a determination "would appear to require 'a searching and therefore impermissible inquiry into church polity.'" *Id.* (quoting <u>Serbian E. Orthodox Diocese v. Milivojevich</u>, 426 U.S. 696, 723, 96 S. Ct. 2372, 2387, 49 L. Ed. 2d 151, 170). This may be especially true where, as here, the parties dispute the structural form of the denominational church organization. Moreover, the polity approach cannot be applied to all church-property cases, for instance, where the organizational structure of the

---

[5] That is, the local church "is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." <u>Watson</u>, 80 U.S. (13 Wall.) at 722–23, 20 L. Ed. at 674.

denomination is "connectional" or "congregational"[6] resort must be made to "the ordinary principles which govern voluntary associations." Watson, 80 U.S. (13 Wall.) at 725, 20 L. Ed. at 675. This would result in two rules, one for "hierarchical" churches (polity approach) and another for all other churches ("ordinary principles," i.e., neutral principles of law). *See id.* at 725–27, 20 L. Ed. at 675–76.

The neutral-principles approach is "completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." Jones, 443 U.S. at 603, 99 S. Ct. at 3025, 61 L. Ed. 2d at 784–85. The neutral-principles approach was first developed by Maryland and Georgia. *See id.* at 602–04, 99 S. Ct. at 3025–26, 61 L. Ed. 2d at 784–85. In reviewing the application of the approach in those states, the Court noted that when determining whether a trust had been created, the state courts considered the "language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." *Id.* But, the Court cautioned that, where civil courts undertake an examination of "certain religious documents, such as a church constitution," they "must take special care to scrutinize the document in purely secular terms." *Id.* at 604, 99 S. Ct. at 3026, 61 L. Ed. 2d at 785. In this respect, the civil courts will give effect to the intention of the parties, "provided it is embodied in some legally cognizable form." *Id.* at 606, 99 S. Ct. at 3027, 61 L. Ed. 2d at 786. This allows "States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Id.* at 604, 99 S. Ct. at 3026, 61 L. Ed. 2d at 785 (quoting Hull, 393 U.S. at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665) (alteration in original) (internal quotation marks omitted).

The lesson of Jones is that, subject to the limitations of the First Amendment, states are free to apply their own "well-established concepts of trust and property law" to church property

---

[6] That is, "a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." Watson, 80 U.S. (13 Wall.) at 722, 20 L. Ed. at 674.

disputes.[7]  *Id.* at 602–03, 99 S. Ct. at 3025, 61 L. Ed. 2d at 784–85 ("Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes.").  Because the neutral-principles-of-law approach permits greater fairness, consistency, and equality of application to all church property disputes regardless of the structure of the denominational church organization, we adopt the neutral-principles-of-law approach for settling property disputes between religious organizations in Indiana.[8]

---

[7] Some state courts have apparently read Jones as an affirmative rule *requiring* the imposition of a trust whenever the denominational church organization enshrines such language in its constitution.  *See, e.g.*, Episcopal Church in the Diocese of Conn. v. Gauss, 28 A.3d 302, 325 (Conn. 2011) ("Jones thus not only gave general churches explicit permission to create an express trust in favor of the local church but stated that civil courts would be *bound* by such a provision, as long as the provision was enacted *before* the dispute occurred."), *cert. denied*, ___ U.S. ___ (2012); Presbytery of Greater Atlanta, Inc. v. Timberridge Presbyterian Church, Inc., 719 S.E.2d 446, 454 (Ga. 2011) ("[T]he fact that a trust was not created under our state's generic express (or implied) trust statutes does not preclude the implication of a trust on church property under the neutral principles of law doctrine."), *cert. denied*, ___ U.S. ___ (2012).  We do not understand Jones as creating such a rule.  First, such a rule would result in *de facto* compulsory deference by enforcing the claim of the denominational church organization merely because the trust claim is added to the denominational church organization's constitution and *regardless of any contrary evidence or state law*.  Not only did the Court reject imposing a "compulsory deference" rule in all cases, Jones, 443 U.S. at 605, 99 S. Ct. at 3026, 61 L. Ed. 2d at 786, the Court specifically approved Justice Brennan's assertion in Sharpsburg II that states may resolve church property disputes under *any* method so long as that approach does not abridge the First Amendment.  *Id.* at 602, 99 S. Ct. at 3025, 61 L. Ed. 2d at 784 (quoting Sharpsburg II, 396 U.S. at 368, 90 S. Ct. at 500, 24 L. Ed. 2d at 584 (Brennan, J., concurring)) ("[T]he First Amendment does not dictate that a State must follow a particular method of resolving church property disputes.  Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'").  Second, the Court approved the neutral-principles approach as an acceptable means of applying *state property and trust law*.  *See id.* at 604, 99 S. Ct. at 3026, 61 L. Ed. 2d at 785 ("The neutral-principles method, *at least as it has evolved in Georgia . . . .*" (emphasis added)).  Thus, the Court's expression that "the constitution of the general church can be made to recite an express trust in favor of the denominational church" organization, was *one example* of a means by which parties may be able to express their intent, "provided it is embodied in some legally cognizable form" under state law.  *See id.* at 606, 99 S. Ct. at 3027, 61 L. Ed. 2d at 786.  As explained below, under Indiana trust law, whether under an express or implied trust theory, the intent of the owner (settlor) to create a trust must be demonstrated.  *See* Flying Squadron Found. v. Crippen, 201 Ind. 482, 524, 169 N.E. 843, 857 (1930); Richards v. Wilson, 185 Ind. 335, 368–69, 112 N.E. 780, 790 (1916); *see also* Holsapple v. Shrontz, 65 Ind. App. 390, 397, 117 N.E. 547, 549 (1917), *trans. not sought*.  Thus, under Indiana law, a claim of trust by the purported beneficiary (e.g., insertion of a trust clause into a denominational church organization's constitution), without indicia of intent on the part of the owner (settlor), is insufficient to impose a trust.

[8] The Supreme Court ultimately remanded Jones for determination of whether Georgia "was adopting a presumptive rule of majority representation" when the identity of the local church is disputed (i.e. when separate factions of a local church schism each claim the corporate designation associated with the identity of the local church).  Jones, 443 U.S. at 606–10, 99 S. Ct. at 3027–29, 61 L. Ed. 2d at 787–89.  Because the corporate membership of Olivet is not disputed by the parties, we decline to address this issue today.

In the application of this approach, Indiana courts may consider Indiana statutes, the language of the deeds and conveyances, the local church charters or articles of incorporation, the constitution of the denominational church organization, and any other relevant and admissible evidence provided they "scrutinize the[se] document[s] in purely secular terms" consistent with Indiana law.[9]  *See id.* at 604, 99 S. Ct. at 3026, 61 L. Ed. 2d at 785.  In this respect, Indiana courts should apply neutral principles of Indiana trust and property law without regard to the organizational structure of the religious denomination, *id.* at 443 U.S. at 605, 99 S. Ct. at 3026, 61 L. Ed. 2d at 786 ("The neutral-principles approach . . . obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes."), whether interpreting the language of a deed or conveyance or determining whether there exists an express or implied (constructive or resulting) trust.[10]

---

[9] The Supreme Court also stated that there may be cases where these documents incorporate "religious concepts in the provisions relating to the ownership of property.  If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the *doctrinal issue* by the authoritative ecclesiastical body." Jones, 443 U.S. at 604, 99 S. Ct. at 3026, 61 L. Ed. 2d at 785 (emphasis added).  But the Court also noted that this scenario "should be gradually eliminated as recognition is given to the obligations of 'States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.'"  *Id.* (quoting Hull, 393 U.S. at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665) (alteration in original).  We likewise think such circumstances should be few. And, regardless, Indiana courts should first seek to interpret these provisions in secular terms applying neutral principles of Indiana law.  Only when certain terms or provisions may not be understood without interpretation of ecclesiastical doctrine and those terms or provisions are needed to apply Indiana law, should resort be made to the authoritative ecclesiastical body.  Moreover, such resort should be limited to those specific terms or provisions necessary to give the documents effect under neutral principles of Indiana law.

[10] We acknowledge that prior Indiana cases have used a variety of approaches to resolve church property disputes. *See, e.g.*, Smart v. Ind. Yearly Conference of Wesleyan Methodist Church of Am., 257 Ind. 17, 271 N.E.2d 713 (1971); Ind. Annual Conference Corp. v. Lemon, 235 Ind. 163, 131 N.E.2d 780 (1956); Emberry Cmty. Church v. Bloomington Dist. Missionary and Church Extension Soc'y, Inc., 482 N.E.2d 288 (Ind. Ct. App. 1985), *trans. not sought*; Hinkle Creek Friends Church v. W. Yearly Meeting of Friends Church, 469 N.E.2d 40 (Ind. Ct. App. 1984), *trans. denied*; Grutka v. Clifford, 445 N.E.2d 1015 (Ind. Ct. App. 1983), *trans. denied*; Marich v. Kragulac, 415 N.E.2d 91 (Ind. Ct. App. 1981), *trans. denied*; Draskovich v. Pasalich, 151 Ind. App. 397, 280 N.E.2d 69 (1972), *trans. denied*; United Methodist Church v. St. Louis Crossing Indep. Methodist Church, 150 Ind. App. 574, 276 N.E.2d 916 (1971), *trans. not sought*; Price v. Merryman, 147 Ind. App. 295, 259 N.E.2d 883 (1970), *trans. denied*; Presbytery of Indianapolis v. First United Presbyterian Church, 143 Ind. App. 72, 238 N.E.2d 479 (1968), *amended on denial of reh'g*, 143 Ind. App. 271, 240 N.E.2d 77 (1968), *trans. denied*.

Several of these cases (e.g., Smart, Lemon, Draskovich, St. Louis Crossing, Merryman, and Presbytery of Indianapolis) were decided without the benefit of the Supreme Court's elucidation of the neutral-principles approach in Jones v. Wolf and were attempting to anticipate the Supreme Court's ultimate

8

## 2. Indiana Trust Law

An express trust must be evidenced by a writing signed by the owner of the property (i.e., the settlor). Ind. Code § 30-4-2-1(a). The burden of proof rests on the party seeking to impose the trust. *See* Matthews v. Adoniram Grand Lodge, 129 Ind. App. 395, 403, 154 N.E.2d 806, 809 (1958) ("It is the law in Indiana that when an attempt is made to impress a trust upon real property when legal title is held by another, that the burden of establishing said trust is upon the one asserting, or claiming the benefit of the trust . . . ."), *trans. denied*; *see also* Webster v. Webster, 135 Ind. App. 53, 55, 184 N.E.2d 897, 899 (1962) (stating that plaintiff-appellant bore the burden of proving existence of oral trust), *trans. denied*. Certain terms are essential to the creation of a trust and must be "sufficiently definite" and "ascertained with reasonable certainty" from the writing(s), otherwise the trust must fail: (1) the trust property; (2) the settlor; (3) the identity of the trustee; (4) the identity of the beneficiary; and (5) the purpose of the trust. Ind. Code § 30-4-2-1(b); *see also id.* cmt. (b) ("This subsection retains the existing law."); Baker v. Gordon, 130 Ind. App. 585, 596, 164 N.E.2d 118, 124 (1960), *trans. denied*; Holsapple v. Shrontz, 65 Ind. App. 390, 397, 117 N.E. 547, 549 (1917), *trans. not sought*. These terms may be set forth in multiple writings so long as they are sufficiently "referred to and connected with" the signed writing such that they may be read as single transaction, Ransdel v. Moore, 153 Ind. 393, 400, 53 N.E. 767, 769 (1899); *cf.* Ross v. Thompson, 128 Ind. App. 89, 100, 146 N.E.2d 259, 265 (1957) ("[Such] [w]ritings . . . are to be read in their setting, and the court may be aided

_____

resolution of the issue. A few other cases were decided after Jones v. Wolf but either failed to apply it (Emberry) or applied it inconsistently (Hinkle Creek Friends, Grutka, and Marich): In Emberry, 482 N.E.2d at 292–93, the Court of Appeals makes no mention of Jones, relying instead on the pre-Jones decisions of Lemon and St. Louis Crossing. In Hinkle Creek Friends, 469 N.E.2d at 41–44, the Court of Appeals applied both the hierarchical-deference approach and the neutral-principles approach to uphold the trial court's order vesting ownership of all property in the denominational church organization where the property deed contained an express reservation in favor of the denominational church organization. In Grutka, 445 N.E.2d at 1018–22, 1025, the Court of Appeals applied the neutral-principles approach in reversing the trial court's grant of summary judgment regarding the existence of a trust on cemetery property and remanded for a factual determination of the title-holder's intent to create a trust but applied a hierarchical-deference approach to determine the distribution of property if the trial court determined that the trust was not formed. In Marich, 415 N.E.2d at 101, the Court of Appeals remanded for a factual determination of the "hierarchical structure" of the denominational church organization based upon "neutral principles of law." To the extent that these cases may be understood as divergent from our holding today, they are disapproved.

by oral evidence as to the position, situation, circumstances, and surroundings of the party at the time of the execution of the deed and the writings."), *trans. not sought*, provided that there is a "clear and unequivocal" demonstration of the settlor's intent to create a trust, <u>Richards v. Wilson</u>, 185 Ind. 335, 368, 112 N.E. 780, 790 (1916); *see also* <u>Holsapple</u>, 65 Ind. App. at 397, 117 N.E. at 549 (stating that the intent to create a trust must be "clear"). Such heightened proof is necessary to protect the sanctity of property ownership against trust claims not intended by the settlor (i.e., the owner).

Implied trusts are "creatures of equity, imposed to do justice," and, in Indiana, they arise in two forms: constructive trusts and resulting trusts. <u>Melloh v. Gladis</u>, 261 Ind. 647, 655–56, 309 N.E.2d 433, 438–39 (1974). Constructive trusts are generally imposed when legal title is gained through wrongful means (e.g., fraud, duress, undue influence, theft, etc.). *Id.* We need not consider the existence of a constructive trust here because no claim is made that Olivet acquired its property through wrongful means. As such, we need only consider the possibility of a resulting trust, which is generally imposed in three circumstances: "(1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person." *Id.* at 655, 309 N.E.2d at 438 (quoting 5 Scott on Trusts § 404.1). It is only the first of these circumstances, the failure of an express trust, that is implicated by the facts of this case. Such a resulting trust is created by operation of law to give effect to the parties' intentions when they have otherwise failed to satisfy the statutory requirements for creating an express trust. *See id.* And, as in the case of express trusts, the party seeking to impose the trust bears the burden of proof. *See* <u>Workman v. Douglas</u>, 419 N.E.2d 1340, 1345 (Ind. Ct. App. 1981), *trans. not sought*. As with express trusts, the settlor's intent is crucial to the resulting trust analysis. <u>Flying Squadron Found. v. Crippen</u>, 201 Ind. 482, 524, 169 N.E. 843, 857 (1930).

### 3. Competing Motions for Summary Judgment

The parties' separate motions for summary judgment each designate the same stipulated

10

statement of facts and stipulated exhibits.[11]

In reviewing an appeal of a motion for summary judgment ruling, we apply the same standard applicable to the trial court. Wilson v. Isaacs, 929 N.E.2d 200, 202 (Ind. 2010). Summary judgment is appropriate where the designated evidence "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). Review is limited to those facts designated to the trial court, T.R. 56(H), and "[a]ll facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party." Mangold ex rel. Mangold v. Ind. Dept. of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). The fact that each party sought summary judgment does not alter our analysis. *See* Sees v. Bank One, Ind., N.A., 839 N.E.2d 154, 160 (Ind. 2005). Rather, we "consider each motion separately construing the facts most favorably to the non-moving party in each instance." *Id.*

The parties' stipulations reveal the following relevant facts. The Olivet congregation first joined the Cumberland Presbyterian Church in 1900. In 1906, Olivet became a member of the United Presbyterian Church in the U.S.A. ("UPCUSA") when it merged with the Cumberland Presbyterian Church. In 1968, Olivet purchased the property and built the church building that is the subject of dispute in this case.[12] The property was conveyed by warranty deed to "Olivet Presbyterian Church of Evansville, Indiana," Stip. Facts ¶ 21, and has at all relevant times been titled and recorded as the property of Olivet. The real estate and church building were acquired entirely with monies donated to or borrowed by Olivet. The Presbytery, and its associated plaintiff, contributed no monies to the purchase of the real estate.

In the early 1980s, the UPCUSA and the Presbyterian Church of the United States merged to become the PC(USA)—the parent organization of the Presbytery and its associated plaintiff. In 1981, shortly before this merger was finalized, the UPCUSA, the predecessor of the

---

[11] Olivet also designated affidavits from various individuals in support of its motion for summary judgment. The Presbytery challenged the admissibility of these affidavits before the trial court and challenges them again on appeal. However, we need not separately address their admissibility because our conclusions are not altered even if we consider the facts asserted in these affidavits.

[12] The Presbytery also claims a trust over certain personal property held by Olivet, including various bank accounts.

PC(USA), amended its constitution, which consists of two documents, the Book of Confessions (principally expressing tenets of faith, totaling nearly 300 pages) and the Book of Order (covering the government, worship, and discipline within the PC(USA), consisting of 39 chapters and 6 appendices, totaling nearly 400 pages). *See generally* Book of Confessions (2004); Book of Order: 2005–2007 (2005). The 1981 amendment inserted into the nearly 700 pages of governing documents two paragraphs that serve as the basis of the Presbytery's claim of a trust on Olivet's property:

> All Property Held in Trust
>
> All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).
>
> . . . .
>
> Property Used Contrary to Constitution
>
> Whenever property of, or held for, a particular church of the Presbyterian Church (U.S.A.) ceases to be used by that church as a particular church of the Presbyterian Church (U.S.A.) in accordance with this Constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery.

Book of Order: 2005–2007 §§ G-8.0201, G-8.0301. When the merger was finalized in 1983, these provisions became a part of the PC(USA) Constitution, and Olivet became a member of the newly-formed PC(USA) by default as result of its membership with the predecessor UPCUSA.

Olivet amended its bylaws several times during its affiliation with the PC(USA) and its predecessors. The most recent of these occurred in 1978, 1998, and 2000. The 1978 bylaws, which went into force *before* the inclusion of the trust provisions in the denominational organization's constitution, included a provision stating that the PC(USA) Constitution "is in all its provisions obligatory upon it and its members." Stip. Ex. 37-E (this document contains the signatures of Olivet's then-pastor and of the then-Clerk of Session). The only other signed document is the minutes of the August 25, 1983, Olivet Session meeting. These minutes include one relevant entry, which states: "The clerk was requested to edit the By-Laws of Olivet Presbyterian Church to bring them in line with the Book of Order changes as a result of the Reunion of the United

Presbyterian Church in the U.S.A. and the Presbyterian Church in the United States." Stip Ex. 37-F. The 1998 and 2000 bylaws state that Olivet "recognizes the constitution of [the PC(USA)] as the authority for the governance of the church and its congregations" but are silent as to whether Olivet adopts or recognizes the PC(USA) Constitution as the authority controlling property ownership. Stip. Exs. 42, 45.

In 1994, Olivet filed articles of incorporation with the Indiana Secretary of State. These corporate articles included language that would apply in the event of a future corporate dissolution, specifically that "[a]ll assets become the property of Ohio Valley Presbytery upon dissolution of this church." Stip. Ex. 38. The record also reveals that in 1998 the Presbytery made two separate loans totaling $65,000 to Olivet. Each loan was secured by separate mortgages on Olivet's real estate.

After over a decade of deliberation, Olivet, in 2006, (with a 98% approval vote of its congregation) decided to disassociate from the PC(USA). Olivet requested to be released from the PC(USA) "with property and finances, to the Evangelical Presbyterian Church." Stip. Facts ¶ 60. In response, the PC(USA), through its Presbytery, offered to "release" Olivet from membership in the PC(USA) on condition that, while negotiations continue regarding "the issue of the disposition of the church and its real property," Olivet must agree to treat the building as leased from the Presbytery for eight months and pay $1.00 as lease consideration and, if a settlement is not agreed, then for up to one more year "at the current market value for such space in Evansville, Indiana." Stip. Ex. 61. Olivet did not accept this proposal, and the Presbytery instituted this litigation. Following the summary judgment motions filed by Olivet and the Presbytery, the trial court entered judgment in favor of Olivet and the Presbytery appealed, requesting both (a) the reversal of the judgment for Olivet and (b) the grant of the Presbytery's motion for summary judgment.

A. *Olivet's Motion for Summary Judgment*

The Presbytery contends on appeal that the trial court erred in granting Olivet's motion for summary judgment. In this motion, Olivet contends that there are no genuine issues of mate-

rial fact and that, as a matter of law, the designated evidence demonstrates that no trust on its property, express or implied, exists in favor of the PC(USA).

As noted above, an express trust must be evidenced by a writing which is signed by the owner (settlor).  Here, the only signed document, contemporaneous to the insertion of the trust provision in the PC(USA) constitution, is the signed minutes of the August 25, 1983, Olivet session meeting, which note that the "clerk was *requested* to edit the By-Laws of Olivet Presbyterian Church to bring them in line with the Book of Order changes as a result of the Reunion of the United Presbyterian Church in the U.S.A. and the Presbyterian Church in the United States." Stip Ex. 37-F (emphasis added).  The minutes do not establish, however, that such "request" was anything more than a request of a single member of the session; nor that the request was formulated as a motion or was voted upon and approved by the session, Olivet's governing body; nor that such request was ever implemented as a formal bylaw revision being proposed and approved by the session. *See* Stip. Ex. 37 ("No copy of changes found.").

The Presbytery separately argues that these 1983 session minutes, when read in conjunction with Olivet's bylaws from 1998 and 2000 and combined with the property trust provisions added to the Book of Order almost twenty years earlier, "effectuate an express trust under Indiana law." Appellants' Br. at 32.  While the terms of a trust may be set forth in multiple writings so long as they are "referred to and connected with" the signed writing such that they are "a part of the [same] transaction," Ransdel, 153 Ind. at 400, 53 N.E. at 769, the three writings are not "sufficiently definite" to establish an express trust "with reasonable certainty."  Ind. Code § 30-4-2-1(b).  The bylaws of Olivet from 1998 and 2000 state that Olivet "recognizes the constitution of [the PC(USA)] as the authority for the governance of the church and its congregations" and that the bylaws "shall not be amended so as to conflict with the Constitution of the [PC(USA)]." Stip. Exs. 42, 45 (emphasis omitted).  The PC(USA) Constitution includes the Book of Order and its 1981 trust provisions.  However, the 1983 session minutes and the 1998 and 2000 bylaws do not refer and connect with each other such that they can be read as part of the same transaction. *See* Ransdel, 153 Ind. at 400, 53 N.E. at 769.  Furthermore, even assuming that Olivet's 1983 session minutes and its 1998 and 2000 bylaws could constitute a signed writing, the relevant language in these documents is not a "clear and unequivocal" statement of Olivet's intent to

14

create a trust on its property.  Richards, 185 Ind. at 368, 112 N.E. at 790.

We find from the designated evidence and its resulting inferences, construing them favorable to the Presbytery as non-movant, that there is no genuine issue of fact and that neither Olivet's 1983 session minutes nor its bylaws from 1998 or 2000, whether considered separately or together, are sufficient acts by Olivet to declare its intention to create an express trust on its property in favor of the PC(USA).  For this reason, as to the Presbytery's claim of express trust, Olivet was entitled to partial summary judgment.

In addition to the Presbytery's claim of express trust, however, it alternatively seeks the imposition of an implied trust on Olivet's property.  The Presbytery contends that a "lengthy history and a deep relationship between Olivet and the [PC(USA)] . . . should result in imposition of a trust on the Property" as a matter of equity.  Appellants' Br. at 33.  As discussed above, upon the failure of an express trust, a resulting trust may be implied by operation of law to give effect to the intent of the parties when they have otherwise failed to satisfy the statutory requirements for creating an express trust.  *See* Melloh, 261 Ind. at 655, 309 N.E.2d at 438.  As with express trusts, the settlor's intent is crucial to the resulting trust analysis.  Crippen, 201 Ind. at 524, 169 N.E. at 857.

As noted in Part 2, a resulting trust may be imposed by operation of law to give effect to the parties' intentions when there has been a failure to satisfy the statutory requirements for creating an express trust.  Olivet must demonstrate that the designated evidence and its reasonable inferences undisputedly establish the absence of a mutual intent on the part of Olivet and the Presbytery to create the claimed trust.  With respect to the PC(USA), its intention to create the trust is supported by the 1981 trust provisions of the Book of Order.  *See* Book of Order: 2005–2007 §§ G-8.0201, G-8.0301.  With respect to Olivet, however, the issue is less clear.  We must consider Olivet's recognition of the PC(USA) Constitution "as the authority for the governance of the church and its congregations," Stip. Exs. 42, 45 (bylaws of 1998 and 2000), and Olivet's continuance as a member of the PC(USA) from 1983 until 2006.  Viewing the designated evidence in favor of the non-moving party, as required on summary judgment, while Olivet's 1998 and 2000 bylaws do not discuss property ownership, a finder of fact could find conflicting infer-

15

ences from the fact that Olivet remained a member of the PC(USA) for nearly twenty-five years after insertion of the trust provisions. It is possible that inferences from the designated evidence may be drawn to support either of two opposite conclusions: that Olivet did or did not intend to create a trust on its property. The result is a disputed issue of material fact, and thus there remains a genuine issue of fact for trial, rendering summary judgment improper. This disputed issue of fact precludes summary judgment for Olivet as to the Presbytery's claim of an implied resulting trust in favor of the PC(USA).

*B. The Presbytery's Motion of Summary Judgment*

The Presbytery argues on appeal that the trial court erred in failing to grant its motion for summary judgment seeking to impose a trust on Olivet's property in favor of the PC(USA) as a matter of law. To succeed, the Presbytery must show from the designated evidence that the undisputed facts conclusively establish either an express or an implied resulting trust. As to the claim of express trust, we have already concluded to the contrary in Part 3, A. We have found from the designated facts and their resulting inferences that Olivet's 1983 session minutes are not sufficiently connected with its bylaws from 1998 or 2000 to constitute a signed writing and that, even if they were, the relevant language in these documents is not a "clear and unequivocal" statement of Olivet's intent to create a trust on its property. Richards, 185 Ind. at 368, 112 N.E. at 790. Therefore, the Presbytery was not entitled to summary judgment on its claim of express trust.

With respect to the Presbytery's claim of implied resulting trust, summary judgment is likewise not appropriate on the evidence. Even when reviewing the designated evidence and inferences most favorable to the Presbytery on Olivet's motion for summary judgment, we determined that reasonable inferences lead to a disputed issue of material fact thus precluding summary judgment on the claim of implied resulting trust. Because this issue is one on which there remains a genuine issue of fact for trial, summary judgment is improper.

**4. Conclusion**

16

We hold that neither the Presbytery nor Olivet are entitled to summary judgment completely resolving this case in their favor. Genuine issues of disputed fact, resulting from varying inferences possible from the designated evidence, must be resolved at trial rather than on summary judgment. With respect to the Presbytery's claim of express trust, the designated evidence and its reasonable inferences show that there is no genuine issue of fact and that, as a matter of law, Olivet did not create an express trust upon its property in favor of the Presbytery or the PC(USA). As to the Presbytery's claim of implied resulting trust, reasonable inferences are possible and thus produce a genuine issue of material fact regarding the requisite unequivocal intent of Olivet to create a trust. This cause is remanded to the trial court for further proceedings consistent with this opinion.

Rucker and David, JJ., concur.

Sullivan and Massa, JJ., dissent, believing the decision and analysis of the Court of Appeals in this case, 940 N.E.2d 1188 (Ind. Ct. App. 2010), to be correct.

**Attachment A**



Source: <u>Family Tree of Presbyterian Denominations</u>, Presbyterian Historical Society, The National Archives of the PC(USA), http://www.history.pcusa.org/history/denominations.cfm (last visited July 19, 2012)

18