# FOR PUBLICATION



**FILED**
Nov 17 2014, 10:27 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**DAVID K. HERZOG**
**JON LARAMORE**
Faegre Baker Daniels LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**BRIAN P. WILLIAMS**
**MICHAEL E. DIRIENZO**
Kahn, Dees, Donovan & Kahn, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHURCH OF THE BRETHREN, SOUTH/CENTRAL INDIANA DISTRICT, | ) ) ) | |
| Appellant-Plaintiff, | ) ) | |
| vs. | ) ) | No. 85A02-1403-PL-166 |
| ROANN CHURCH OF THE BRETHREN, INC., ROANN BREAK-AWAY GROUP, and THE ROANN CHURCH, INC., | ) ) ) ) ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen, III, Judge
Cause No. 85C01-1205-PL-440

**November 17, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Church of the Brethren, South/Central Indiana District ("the Denomination") appeals the trial court's decision, following a bench trial, in favor of Roann Church of the Brethren, Inc. and The Roann Church, Inc. ("the Congregation") on the Denomination's complaint.[1] The Denomination presents one issue for our review, namely, whether the trial court erred when it held that the Congregation did not place its property into an irrevocable trust, express or implied, for the benefit of the Denomination.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The Denomination dates to 1708, and the Congregation traces its origin to mission work performed in Roann, Indiana, in 1835. The two affiliated with one another in the late 1930s. In 1939, the Congregation began sending delegates to the Denomination's Annual Conference,[2] where delegates approved matters regarding denominational polity by two-thirds vote. The Denomination recorded and published denomination polity in its Organization and Polity Manual ("Manual"), which could be revised yearly at the Annual Conference. The Denomination, however, never bound local congregations to the Manual, and it did not impose discipline for any given congregation's disharmony with denominational polity.

In the early 1940s, after separatist groups departed and took property from the Denomination for secessionist uses, the Denomination became concerned about

---

[1] Despite the Denomination's statements in its brief, the evidence adduced at trial demonstrated that "Roann Break-Away Group" is not an entity. Appellant's App. at 8 n.1.

[2] "The Annual Conference is the highest and final legislative authority of [the Denomination]." Appellant's App. at 81.

protecting its assets. Thus, in 1945, the Denomination issued a report that called for the use of restrictive covenants in individual congregations' deeds, and, in 1947, the Denomination approved the placement of the following language into its Organization and Polity Manual:

> The commission believes that[,] for the sake of uniformity and greater security in ownership of [the Denomination's] property, the title to all local church property should be held by local trustees, in trust, for the teaching and dissemination of the gospel of Jesus Christ, according to the beliefs, practices, and doctrines of [the Denomination], as set forth and promulgated from time to time by Annual Conference.

> * * *

> I.      Uniform Procedure in Conveyance

> * * *

> 2.      Restrictive covenants should be contained in all deeds of conveyance, as follows:

>> a.      That if the property ever ceases to be used in accordance with the provisions set forth . . . , or[,] in cases where the local church has been closed or the property abandoned, the district[3] may, upon the recommendation of the district board, assert title to the property and have the same vested in the district board, as trustees for the district.

Appellant's App. at 140-41. The Denomination devised a method whereby the respective districts could investigate local churches' deeds for the restrictive covenants and negotiate co-ownership of property with local congregations.

Similarly, a later amendment to the Manual suggested language for local congregations' constitutions. It stated:

---

[3] The district acts as an intermediary of sorts between the Denomination and the Congregation. Several congregations form a district.

# CHAPTER IV

## THE LOCAL CHURCH

### I.  Congregational Structure[]

* * *

C.    SUGGESTED CONSTITUTION

* * *

4.    Relationship to the Whole Church

* * *

b.    The church denominational[]

. . . In case of strife or division, if any part of the congregation refuses to abide by its obligation as a member of [the Denomination], that part of the congregation, whether a majority or minority of its membership, that continues in unity with [the Denomination] shall be recognized as the lawful congregation and shall continue in possession of all the property of the congregation.

If the congregation (a) disbands, (b) departs from membership in [the Denomination], or (c) so decreases in numbers and financial strength as to render the congregation unable to fulfill its purpose, the district of [the Denomination] in which it is located, or the successor, shall have the right to take charge and control of all property and thereafter to hold, manage, and convey the same at the discretion of the district. All action taken by the district relating to the property of a congregation shall be in conformity with the provisions of [Chapter VI of the Manual], "Property Holdings and Financial Resources."

* * *

# CHAPTER VI

## PROPERTY HOLDINGS AND FINANCIAL RESOURCES[]

I. In the Congregation

\* \* \*

A.   TRUST RELATIONSHIP

All property owned by a congregation, whether incorporated or unincorporated, shall be held, in trust, for the use and benefit and in conformity with practices and beliefs of [the Denomination]. All documents shall conform to the legal requirements of the various states, territories, or other possessions of the United States or foreign countries.

\* \* \*

D.   TRANSFER OF CONGREGATIONAL PROPERTY

\* \* \*

3.   Disorganizing or Withdrawing Congregation

If a congregation . . . attempts by either majority or unanimous vote to withdraw from [the Denomination] district in which it is located or otherwise ceases to exist or function as a congregation of [the Denomination], any property that it may have shall be within the control of the district board and may be held for the designated purposes or sold or disposed of in such a manner as the district board, in its sole discretion, may direct. . . .

Id. at 85-87, 93-96 (emphasis removed). The Denomination encouraged, but did not require, that all congregations adopt the suggested language.

In the 1980s, the Congregation acquired, by three separate warranty deeds, the property at issue in this litigation. None of those deeds—all titled in the Congregation's name—contained the restrictive covenant recommended by the Denomination, and the district never made inquiry into this issue. The Congregation purchased the property with monies from member donations and an interest-bearing loan from the Denomination,

5

which the Congregation later repaid in full. The Congregation also possesses several bank accounts at issue here, which are titled in the Congregation's name. On the face of these assets, the Denomination has no interest in the Congregation's property, real or personal.

Despite having not included the restrictive covenant in its deeds, in 2002, the Congregation amended its Constitutional Guidelines and Bylaws ("2002 Constitution") to reflect some of the Manual's language from Chapter IV. Specifically, the 2002 Constitution stated:

> 4.      Relationship to the Whole Church
>
> * * *
>
> B.      The Church Denominational
>
> . . . In case of strife or division in the local church, should any part of the congregation refuse to abide by its obligation as a member of [the Denomination], that part of the congregation, whether a majority or minority of its membership, that continues in unity with [the Denomination] shall be recognized as the lawful congregation and shall continue in possession of all the property of the congregation.
>
> If the congregation (a) disbands, (b) departs from membership in [the Denomination], or (c) so decreases in numbers and financial strength as to render the congregation unable to fulfill its purpose, the district of [the Denomination] in which it is located, or the successor, shall have the right to take charge and control of all property and thereafter to hold, manage, and convey the same at the discretion of the district. All action taken by the district relating to the property of a congregation shall be in conformity with [Chapter VI of the Manual]: "Property Holdings and Financial Resources"[].

Id. at 147 (emphasis removed). The 2002 Constitution did not include the trust language from Chapter VI of the Manual, and a later provision reserved the unqualified right to

6

amend "[t]his Constitution and Bylaws . . . at Church Council by two[-]thirds vote of members present." Id. at 169. Further, Clifton "Corky" Cordes, the Congregation's head elder, a several-time delegate to the Annual Conference, and the chair of the 2010 Constitutional Committee, testified on cross-examination that the Congregation included the word "Guidelines" in the title of its Constitutional Guidelines and Bylaws to indicate that the Congregation could amend the document. "It wasn't hard and fast . . . . It wasn't . . . something you had to abide by specifically." Tr. at 66.

Subsequent to the adoption of the 2002 Constitution, a schism developed in the Congregation regarding the continuation of its relationship with the Denomination. Reflecting this growing divide, in 2010, the Congregation amended its Constitutional Guidelines and Bylaws ("2010 Constitution") to read as follows:

3.      Relationship to the Whole Church

* * *

B.      We belong to Christ and denominational ties are secondary. The congregation shall covenant to faithfully support the beliefs of the early Church founders, recognizing Annual Conference enactments of [the Denomination] as having influence in our congregational life. We shall remain members of [the Denomination] or its successor as long as the denomination remains true to God's word. . . .

Appellant's App. at 181 (emphasis removed). The Congregation's purpose behind the change was to "intentionally . . . strip[] out some of the national language [from the 2002 Constitution] because . . . [the Congregation] didn't want the strings [to] national . . . ." Tr. at 63. According to Cordes, the 2010 Constitution replaced the 2002 Constitution in its entirety. The 2010 Constitution also reserved the right to amend.

7

On March 27, 2012, the fracture within the Congregation reached its apex, and it held a vote to determine whether it would remain affiliated with the Denomination. Eighty-five members voted to leave the Denomination, eight voted to remain, and two abstained. Thereafter, on April 3, the Denomination recorded an Affidavit of Transfer of Land with the Wabash County clerk to transfer title of the Congregation's property to the district.[4] Then, on May 21, the Denomination filed a complaint for declaratory and injunctive relief that asked the court to declare that the 2002 Constitution created a trust in its favor, which, under then-existing Indiana law, was irrevocable. Moreover, it sought to enjoin the Congregation's further use of the property. The Congregation counterclaimed for slander of title because of the cloud on title that the affidavit created.

After mediation failed, the trial court held a bench trial on November 19 and 20, 2013, after which the court entered judgment for the Congregation on the Denomination's claims but rejected the Congregation's counterclaim.[5] After it lamented that the parties—"church folk who worship God Almighty"—could not resolve the dispute "among themselves, as Christians, without resort to Court process," the court found, in relevant part:

> 7. . . . [The Congregation] received benefits by affiliating with [the Denomination], including but not limited to: Becoming part of a network of like-minded churches; licensing and ordination of pastors; and providing contract forms. Likewise, [the Denomination] received benefits from that affiliation as well because, among other benefits, [the Congregation] contributed monies to [the Denomination].

---

[4] The Denomination had used this method of property transfer successfully on two prior occasions in Indiana.

[5] The Congregation does not cross-appeal the denial of its counterclaim.

8. On or about 1945, at Annual Conference, a committee report concerning [the Denomination's] control of property was prepared. Part of that report provided that the restrictive covenants should be included in deed(s) to hold the individual congregations['] church property in trust. Additionally, [the Denomination] submitted evidence of other documents including similar language in support of their complaint.

9. . . . Sometime in the mid to late 1980's [sic], the congregation . . . built its third set of buildings, which account for its current location. . . . Three (3) separate deeds acquired the property. According to the last set of deeds, [the Congregation] is the fee simple owner of the real estate in Wabash County. None of the three (3) sets of deeds provide for any trust interest in [the Denomination]. All of [the Congregation's] assets, real and personal, were created or acquired by local church members. The assets are of substantial value.

10. [The Congregation's] financial accounts are on deposit . . . , and each is titled in the name of [the Congregation] only. In the history of [the Congregation], none of the accounts has ever been registered in the name of [the Denomination], nor ha[s] title to the accounts ever reflected that [the Denomination] ha[s] an interest in the accounts, trust or otherwise.

11. [The Denomination] has never been listed as a named insured on the real estate (or property) owned by [the Congregation] and has never had any liability for any of [the Congregation's] debts.

12. This entire controversy could have been avoided had [the Denomination] simply made reasonable inquiry into the public documents and records and ensured that [the Congregation's] deed(s) contained trust language or that amended deed(s) containing such trust language were prepared and recorded. Then the intent of the parties would not be subject to dispute. That did not occur.

* * *

3. [The Denomination] has failed to establish by the required burden of proof that a trust, of whatever nature and from whatever source, was ever created in favor of [the Denomination] as to [the Congregation's] property, real or personal. <u>There is simply no credible evidence that [the Congregation], at any time, intended to place [its] property in trust for the use and benefit of [the Denomination]</u>. . . .

Appellant's App. at 8, 10-12 (emphasis added). This appeal ensued.

9

## DISCUSSION AND DECISION

### Express Trusts

The Denomination first contends that the trial court erred when it found that the 2002 Constitution did not create an express trust. "A trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held." Ind. Code § 30-4-1-1(a) (2014). "A trust in either real or personal property is enforceable only if there is written evidence of the terms of the trust bearing the signature of the settlor or the settlor's authorized agent." I.C. § 30-4-2-1(a). "[N]o formal language is required to create a trust," I.C. § 30-4-2-1(b), but as our supreme court stated in Presbytery of Ohio Valley, Inc. v. OPC, Inc., 973 N.E.2d 1099, 1108-09 (Ind. 2012) (citations and quotations omitted; emphasis supplied):

> [a]n express trust must be evidenced by a writing signed by the owner of the property (i.e., the settlor). The burden of proof rests on the party seeking to impose the trust. Certain terms are essential to the creation of a trust and must be sufficiently definite and ascertained with reasonable certainty from the writing(s)[;] otherwise the trust must fail: (1) the trust property; (2) the settlor; (3) the identity of the trustee; (4) the identity of the beneficiary; and (5) the purpose of the trust. These terms may be set forth in multiple writings so long as they are sufficiently referred to and connected with the signed writing such that they may be read as a single transaction, provided that there is a clear and unequivocal demonstration of the settlor's intent to create a trust. Such heightened proof is necessary to protect the sanctity of property ownership against trust claims not intended by the settlor (i.e., the owner).

When a dispute arises in the context of church property, Indiana applies the neutral-principals-of-law approach because it "permits greater fairness, consistency, and equality of application to all church property disputes regardless of the structure of the

10

denominational church organization." Presbytery, 973 N.E.2d at 1107. As our supreme court explained in Presbytery:

> The neutral-principles approach is "completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges."

> * * *

> In the application of this approach, Indiana courts may consider Indiana statutes, the language of the deeds and conveyances, the local church charters or articles of incorporation, the constitution of the denominational church organization, and any other relevant and admissible evidence provided they "scrutinize these documents in purely secular terms" consistent with Indiana law. Indiana courts should apply neutral principles of Indiana trust and property law without regard to the organizational structure of the religious denomination, whether interpreting the language of a deed or conveyance or determining whether there exists an express or implied (constructive or resulting) trust.

Id. at 1107-08 (quoting Jones v. Wolf, 443 U.S. 595, 603-04 (1979)) (some citations and quotation marks omitted; emphasis supplied).

We also note that, pursuant to the parties' request, the trial court entered findings and conclusions, and

> [w]hen a party has requested specific findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings. In addition, before affirming on a legal theory supported by the findings but not espoused by the trial court, the appellate court should be confident that its affirmance is consistent with all of the trial court's findings of fact and the inferences drawn from the findings. In reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. The judgment will be reversed only when clearly erroneous. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility.

11

Capps v. Abbott, 897 N.E.2d 984, 986 (Ind. Ct. App. 2008).

The Denomination contends that, when the Congregation incorporated suggested language from the Manual into its 2002 Constitution, the Congregation "demonstrated a clear intent" to create a trust. Appellant's Br. at 8. Further, it reasons, the specific incorporated language did not include a reservation of a right to revoke, and, therefore, under Indiana law as it existed in 2002, the purported trust was irrevocable.[6] Id. The Denomination then concludes that the revisions reflected in the Congregation's 2010 Constitution, as a matter of law, were an ineffective attempt to remove any irrevocable trust language from the Constitution. Thus, it asserts, the trial court's judgment is clearly erroneous. We disagree.

Nothing in the language cited by the Denomination evinces a trust relationship. This holding is supported by both the deeds, which did not contain the restrictive covenant or trust language, and the Congregation's 2002 and 2010 Constitutions. Indeed, there is no indication from the 2002 Constitution that the Congregation held its property for the benefit of any entity other than itself. Instead, as the trial court found, the relationship between the Congregation and the Denomination involved mutual benefits, none of which were specific to the Congregation's land. And these cited benefits are no different from those reciprocally flowing in a standard denomination-congregation relationship. In other words, "the relevant language" does not implicate a fiduciary relationship and, therefore, "is not a clear and unequivocal statement of [the

---

[6] In 2002, Indiana law provided that one must expressly reserve the right to revoke or modify a trust; otherwise, the trust would be construed as irrevocable. See I.C. § 30-4-3-1 cmt. (a) (2002) (repealed 2005). But a court may treat "an unrestricted power to modify" a trust "as a power of revocation." I.C. § 30-4-3-1(b) (repealed 2005).

12

congregation's] intent to create a[n] [express] trust." Presbytery, 973 N.E.2d at 1112 (quotations omitted). Moreover, when the Congregation chose to incorporate language from Chapter IV of the Manual, it conspicuously omitted the Manual's trust-creating language from Chapter VI. Further, the trial court's judgment is also supported by the nonbinding nature of both the Denomination's Manual and the Congregation's Constitutional Guidelines and Bylaws.

We are also mindful that Indiana law directs us to "look at the [purported] trust as a whole[,] and [we] cannot take individual clauses out of context." Fulp v. Gilliland, 998 N.E.2d 204, 207 (Ind. 2013) (quotations omitted). Thus, even if the evidence showed that the Congregation intended to create a trust in its 2002 Constitution, that document expressly reserved an unqualified right to amend its provisions, which was a "power to modify" equivalent to a "power of revocation" with respect to any purported trust. I.C. § 30-4-3-1(b) (repealed 2005). Consequently, we also hold that the 2010 Constitution revoked the purported 2002 trust.[7]

**Implied Trust**

The Denomination argues in the alternative that, absent an express trust, in light of the parties' relationship, the trial court should have imposed an implied trust as a matter of law. As our supreme court explained in Presbytery:

> Implied trusts are creatures of equity, imposed to do justice, and, in Indiana, they arise in two forms: constructive trusts and resulting trusts. Constructive trusts are generally imposed when legal title is gained through wrongful means (e.g., fraud, duress, undue influence, theft, etc.). We need not consider the existence of a constructive trust here because no claim is

---

[7] We also note that, insofar as the Denomination asserts that Indiana law precluded the 2010 amendment of the 2002 Constitution, "[i]f the rules of law and the terms of the trust conflict, the terms of the trust shall control . . . ." I.C. § 30-4-1-3.

made that [Congregation] acquired its property through wrongful means. As such, we need only consider the possibility of a resulting trust, which is generally imposed in three circumstances: (1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person. It is only the first of these circumstances, the failure of an express trust, that is implicated by the facts of this case. Such a resulting trust is created by operation of law to give effect to the parties intentions when they have otherwise failed to satisfy the statutory requirements for creating an express trust. And, as in the case of express trusts, the party seeking to impose the trust bears the burden of proof. As with express trusts, the settlor's intent is crucial to the resulting trust analysis.

973 N.E.2d at 1109.

Here, the Denomination makes three arguments: (1) the court's finding that no credible evidence supports the assertion that the Congregation intended to place its property in trust is unsupported by the record; (2) that finding conflicts with the court's other findings and conclusions that the parties could have avoided litigation altogether; and (3) irrespective, the court's findings are erroneous as a matter of law.

The Denomination's first argument is a request for us to reweigh the evidence and judge the credibility of witnesses. But this is not our province; the trial court weighed the evidence—including the language of the deeds, the language of the constitutions, and witness testimony—and found that "[t]here is simply no credible evidence that [the Congregation], at any time, intended to place [its] property in trust for the use and benefit of [the Denomination]." Appellant's App. at 12. For the reasons stated in the express-trust section of this opinion, this was not clearly erroneous.

14

Second, the court's findings and conclusions do not conflict with one another. The two findings and conclusions[8] at issue follow:

> 12. This entire controversy could have been avoided had [the Denomination] simply made reasonable inquiry into the public documents and records and ensured that [the Congregation's] deed(s) contained trust language or that amended deed(s) containing such trust language were prepared and recorded. Then the intent of the parties would not be subject to dispute. That did not occur.

> * * *

> 3. [The Denomination] has failed to establish by the required burden of proof that a trust, of whatever nature and from whatever source, was ever created in favor of [the Denomination] as to [the Congregation's] property, real or personal. There is simply no credible evidence that [the Congregation], at any time, intended to place their property in trust for the use and benefit of [the Denomination]. . . .

Appellant's App. at 11-12. Finding 12 states that no evidence of intent exists, and Conclusion 3 avers that the parties could have avoided Finding 12 by including trust language in the property deeds, which would have made the parties' intent clear—in other words, evidence of intent would have existed—and annulled the need for litigation. Thus, we are not persuaded that Finding 12 and Conclusion 3 are inconsistent with one another.

Finally, the Denomination relies on Presbytery and cases from other jurisdictions[9] to argue that the trial court's findings were erroneous as a matter of law. The Denomination argues that, because of the nature and duration of the parties' relationship with one another, the trial court should have imposed a resulting trust in its favor. In

_____

[8] The Denomination argues that Conclusion 3 is actually a finding of fact, but the trial court incorporated all findings of fact as conclusions of law and vice versa.

[9] For the reasons stated in this decision, Indiana law is sufficient to address the dispositive issues in this appeal, and we decline the Denomination's request for us to apply foreign law here.

15

doing so, the Denomination points to the long relationship between the parties, which lasted more than sixty years, and to the Manual, which it characterizes as imposing a trust "requirement." Appellant's Br. at 22.

But no part of the Manual imposed a requirement of any sort on the Denomination's individual congregations; it provided mere suggestions for local church constitutions. And the Denomination did not discipline individual congregations for divergence from its polity. More importantly, Presbytery does not support the Denomination's position. That case, a summary judgment opinion, held that there was an issue of material fact regarding whether the congregation intended to create a trust in favor of the denomination because "a finder of fact could find conflicting inferences from the fact that [the congregation] remained a member of [the denomination] for nearly twenty-five years after insertion of the trust provisions" into the denomination's Book of Order, which is approximately equivalent to the Denomination's Manual here. Id. at 1113. The court stated, "It is possible that inferences . . . may be drawn to support either of two opposite conclusions: that [the congregation] did or did not intend to create a trust on its property." Id.

Here, in contrast, the trier of fact weighed the evidence and inferences, and it concluded that the Congregation did not intend to create a trust on its property. To reiterate, the court's reasoning finds support in the language of the deeds, which do not contain trust language; in testimony, which labeled the Manual as nonbinding on individual congregations; and in the language of the 2002 Constitution, which did not create a fiduciary relationship and which, in any event, was nonbinding and revocable by

the Congregation. Therefore, the Denomination has not met its burden; it has not shown that the trial court's judgment is clearly erroneous. We affirm the trial court's judgment in all respects.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.